EXHIBIT "B"

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE DAVID ALAN EZRA,
CHIEF UNITED STATES DISTRICT JUDGE
HONOLULU, HAWAII
FEBRUARY 5, 2003
FURTHER JURY TRIAL, VOLUME 4
UNITED STATES OF AMERICA v. MICHAEL F. SCHULZE

For the Defendant:                    H. Dean Steward, Esq.

Government's Witness:                 Cindy Maglasang
                                      Special Agent, FBI


Official Court Reporter:              Cynthia Tando Fazio
                                      RMR,  CRR
                                      United States District Court
                                      P.O. Box 50131
                                      Honolulu, Hawaii 96850


Page Number(s): 4-60, 4-67, 4-85, 4-86, and 4-87

1   is that they cannot initiate criminal acts unless they have

2   been authorized to do so by the FBI, right?

3   A    Correct.

4   Q    And the only criminal acts you would authorize were those

5   that would further the investigation of whatever it is you

6   happen to be investigating, right?

7   A    Correct.

8   Q    Okay.  And you also tell any informant that they are

9   liable to potentially be prosecuted if they commit criminal

10  acts that they aren't authorized to do, right?

11  A    Yes.

12  Q    And that's part of the standard advisement that you give

13  every informant, right?

14  A    Correct.

15  Q    Okay.  And you also tell the informants that they must

16  provide truthful information at all times and must report all

17  positive information, both inculpatory and exculpatory, as

18  promptly as possible; that's part of the advisement, right?

19  A    Yes.

20  Q    So that's really telling the informant that they got to

21  give you both the good information and the bad information,

22  correct?

23  A    Correct.

24  Q    And you also tell them that they have no immunity or

25  protection from arrest or prosecution for anything they say or

1  Q    Okay.  Because he was being supervised by state

2  probation, correct?

3  A    Correct.

4  Q    And you were asking him to get involved in some kind of a

5  drug deal?

6  A    Correct.

7  Q    Okay.  Now, in connection with that state probation, has

8  Steven Olaes received any kind of benefit that you are aware

9  of?

10  A    No.

11  Q    Have you or the prosecutor in this case gone to the -- to

12  the prosecuting agency on the state side and somehow told them

13  that Steve Olaes helped you?

14  A    That he helped us?

15  Q    Yes.

16  A    Well, he -- we were seeking approval for him to start

17  that process to help us.

18  Q    Okay.  And then after that approval and all of the work

19  that Mr. Olaes did, did you go back to these people and say:

20  He did a good for us, take it easy on him, or anything like

21  that?

22  A    No, his probation was over October, early October, like

23  October 5th.

24  Q    Okay.

25  A    So it would have been covered the period of August

1    A    Yes.

2    Q    Okay.  And you know Mr. Olaes was a long-time crystal

3    meth user, correct?

4    A    I don't know how long he used prior to working with us.

5    Q    Okay.  But he did use prior to working with you, right?

6    A    Yes.

7    Q    He had admitted to you from -- that at least from the

8    get-go, correct?

9    A    Yes.

10   Q    Okay.  And what's the purpose that Mr. Olaes told you

11   that he received the three grams sample from Mr. Tabion?  What

12   was that about, what were they supposed to do?

13   A    He just gave it to Steve to see if he could buy -- set up

14   some buyers.

15   Q    Okay.  So it was sort of a resale situation?

16   A    Yeah, it was a sample to give potential buyers or to show

17   potential buyers.

18   Q    Mr. Tabion over to Mr. Olaes and then any potential

19   buyers, right?

20   A    Correct.

21   Q    And in the federal system, that's a conspiracy, is it

22   not?

23   A    Correct.

24   Q    Okay.  And pretty clearly the terms of Mr. Olaes' state

25   probation would be that he commit no crimes, correct?

1    A    Correct.

2    Q    And in this case the minute he took little samples or

3    little amounts out of the drug evidence and didn't tell you

4    about it, that's pretty clear it's a crime, right?

5    A    Yes.

6    Q    So he probably violated his probation while he was

7    working with you in addition, right?

8    A    Yes.

9    Q    Okay.  And just the fact that he stole small amounts of

10   the drugs out of the evidence here, that's pretty clearly flat

11   theft, right?

12   A    Yes.

13   Q    Okay.  Now, when he said to you:  I'm no longer using

14   drugs, and that was an untrue statement, would it have been

15   important for you to have a truthful statement on that issue?

16   A    Yes.

17   Q    I mean, you need to know whether or not the person you're

18   using as an informant is using drugs, right?

19   A    Yes.

20   Q    For the exact reasons that turned out to be problems

21   here, he ends up stealing a little bit of this for his own

22   personal use; that's one problem, right?

23   A    Mm-hmm.

24   Q    And I think we heard earlier in the trial that officer

25   safety is another reason why you really want to at least know

1    whether or not your informant is using drugs, right?

2    A    Yes.

3    Q    And the third reason is because it's simply a crime, both

4    state and federal, to be using illegal drugs under these

5    circumstances, correct?

6    A    Yes.

7    Q    Okay.  So when he says to you he's not using drugs and in

8    truth he is, he's then made a false statement to a federal

9    official, correct?

10    A    Yes.

11    Q    Okay.  So the score card would read then that during the

12    eight to nine months that Mr. Olaes worked with you, he did a

13    false statement to a federal official, drug possession,

14    obstruction of justice, drug distribution, conspiracy,

15    probation violation and theft, right?

16    A    Sure.

17    Q    And any discussion of prosecuting Steve Olaes?

18    A    No.

19    Q    None at all?

20    A    No.

21    Q    You had any discussions with Mr. Olaes about that?

22    A    No.

23    Q    Does he get a free pass for everything he's done?

24    A    At this point we haven't discussed anything.

25    Q    Okay.  Have you discussed whether or not he's going to