ORIGINAL

MICHAEL F. SCHULZE
Register No. 36817-048
Federal Detention Center – Honolulu
Post Office Box 30080
Honolulu, Hawaii 96820

Defendant, pro se

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

MAY 0 4 2007

at____o'clock and____min____M
SUE BEITIA, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO 02–00090–DAE |
| Plaintiff, | ) | |
| | ) | **DEFENDANT'S RESENTENCING** |
| | ) | **STATEMENT AND OBJECTIONS TO** |
| vs. | ) | **THE PRESENTENCE REPORT OF** |
| | ) | **7/18/2003; and CERTIFICATE** |
| | ) | **OF SERVICE** |
| MICHAEL F. SCHULZE, | ) | |
| | ) | Resentencing Date: May 25, |
| Defendant. | ) | 2007 |
| | ) | Time: 1:30 p.m.* |

**COMES NOW** defendant Michael F. Schulze (Schulze), pro se, and hereby submits his Resentencing Statement and Objections to the findings and recommendations contained in the Presentence Investigation Report of July 18, 2003, revised on August 18, 2003, and the Addendum No. 2 of June 6, 2006, to the Resentence Investigation Report of July 18, 2003.

DATED: Honolulu, Hawaii, April 26, 2007.

Respectfully submitted,

MICHAEL F. SCHULZE
Defendant, pro se

* A motion to postpone the May 25th resentencing hearing was filed on April 24, 2007, and is pending.

## TABLE OF CONTENTS

                                                                    PAGE

Table of Authorities Cited .............................................. iii

I.    INTRODUCTION ...................................................... 1

II.   BACKGROUND ........................................................ 2

      A.   The Trial .................................................... 2

      B.   The Sentence ................................................. 6

      C.   The Appeal ................................................... 7

III.  PROCEDURE ON REMAND ............................................... 8

IV.   STATUTORY SENTENCING .............................................. 8

V.    GUIDELINE SENTENCING .............................................. 9

VI.   STANDARD OF PROOF ................................................ 10

VII.  RESENTENCING STATEMENT ........................................... 11

VIII. SPECIFIC OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT ...... 16

      Objections at:

      Pages 3, 4 and 5 ................................................. 16

      ¶12 ............................................................. 16

      ¶¶13 and 14 ..................................................... 17

      ¶¶15, 16 and 17 ................................................. 19

      ¶18 ............................................................. 20

      ¶19 ............................................................. 22

      ¶20 ............................................................. 23

      ¶¶21 and 22 ..................................................... 24

      ¶¶23, 24, 25, 26 and 27 ......................................... 25

      ¶28 ............................................................. 26

      ¶29 ............................................................. 27

      ¶¶30 and 31 ..................................................... 28

      ¶¶32, 33 and 34 ................................................. 29

¶35 ............................................................... 30

¶36 ............................................................... 31

¶¶37 and 38 ....................................................... 35

¶39 ............................................................... 36

¶¶43, 44 and 46 .................................................. 37

¶48 ............................................................... 56

¶51 ............................................................... 58

¶¶53, 55, 57, 60, 62 and 64 ...................................... 67

¶¶66, 82, 83, 84, 85, 87, 89, 90, 91, 92, 93, 95, 97, 98 and 101 . 68

## TABLE OF AUTHORITIES

Appreni v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348 (2000) .............  7

Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531 (2004) .............  7

Burdeau v. McDowell, 256 U.S. 465 (1921) ...............................  19

California Department of Corrections v. Morales,
514 U.S. 499, 115 S.Ct. 1597 (1995) ...................................  53

Custis v. United States, 511 U.S. 458, 114 S.Ct. 1732 (1994) ...........  67

Garner v. Jones, 529 U.S. 244, 120 S.Ct. 1362 (2000) ...................  53

Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781 (1979) ...............  57

Lee v. Illinois, 476 U.S. 530, 106 S.Ct. 2056 (1986) ..................  10

Miller v. Florida, 482 U.S. 423, 1007 S.Ct. 2446 (1987) ...............  54

Neder v. United States, 527 U.S. 1, 199 S.Ct. 1827 (1999) .............  15

Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078 (1993) ............  15

United States v. Bass, 404 U.S. 336, 92 S.Ct. 515 (1971) ..............  15

United States v. Booker, 543 U.S. 220, 125 S.Ct. 738 (2005) ...........  7

United States v. Garcia, 469 U.S. 70, 105 S.Ct. 479 (1984) ............  56

United States v. Havens, 446 U.S. 620, 100 S.Ct. 1912 (1980) ..........  19

Williamson v. United States, 512 U.S. 594, 114 S.Ct. 2431 (1994) ......  10

Chandler v. U.S. Army, 123 F.3d 1296 (9th Cir. 1997) ..................  20

DeGurules v. INS, 833 F.2d 861 (9th Cir. 1987) ........................  58

Gallego v. United States, 276 F.2d 914 (9th Cir. 1960) ................  18

Sussman v. American Broad. Cos. Inc., 186 F.3d 1200 (9th Cir. 1999) ....  19

United States v. Ameline, 409 F.3d 1073 (9th Cir. 2005) ...............  8

United States v. Banuelos, 322 F.3d 700 (9th Cir. 2003) ...............  8

United States v. Buckland, 289 F.3d 588 (9th Cir. 2002) ...............  9

United States v. Buena-Lopez, 987 F.2d 657 (9th Cir. 1993) ............  50

United States v. Candoli, 870 F.2d 496 (9th Cir. 1998) ................  37

United States v. Cantrell, 433 F.3d 1269 (9th Cir. 2006) ..............  9

United States v. Cernobyl, 255 F.3d 1215 (10th Cir. 2001) ............... 11

United States v. Cruz, 127 F.3d 791 (9th Cir. 1997) .................... 50

United States v. Daas, 198 F.3d 1167 (9th Cir. 1999) ................... 16

United States v. Durrive, 902 F.2d 1221 (7th Cir. 1990) ............... 51

United States v. Galloway, 976 F.2d 414 (8th Cir. 1992) ............... 42

United States v. Garcia, 151 F.3d 1242 (9th Cir. 1998) ............... 51

United States v. Godoy, 528 F.2d 281 (9th Cir. 1975) .................. 18

United States v. Gonalez, 420 F.3d 111 (2nd Cir. 2005) ................ 9

United States v. Gore, 154 F.3d 34 (2nd Cir. 1998) ................... 51

United States v. Guittierrez-Hernandez, 94 F.3d 582 (9th Cir. 1996) ..... 10

United States v. Hernandez, 141 F.3d 1042 (11th Cir. 1998) ............. 51

United States v. Hill, 79 F.3d 1477 (6th Cir. 1996) ................... 31

United States v. Hoac, 999 F.2d 1099 (9th Cir. 1993) .................. 61

United States v. Howard, 894 F.2d 1085 (9th Cir. 2000) ................ 10

United States v. Huckins, 53 F.3d 276 (9th Cir. 1995) ................. 10

United States v. Jordan, 291 F.3d 1091 (9th Cir. 2002) ................ 8

United States v. Kaneakua, 105 F.3d 463 (9th Cir. 1997) ............... 67

United States v. Labrada-Bustamante, 428 F.3d 1252 (9th Cir. 2005) ...... 9

United States v. MacDonald, 992 F.2d 960 (9th Cir. 1993) .............. 17

United States v. Maxwell, 34 F.3d 1006 (11th Cir. 1994) ............... 49

United States v. McCoy, 242 F.3d 399 (D.C. Cir. 2001) ................. 60

United States v. McMeen, 49 F.3d 225 (6th Cir. 1995) .................. 16

United States v. Nevarro, 979 F.2d 786 (9th Cir. 1992) ................ 16

United States v. Orozco-Prada, 732 F.2d 1076 (2nd Cir. 1984) .......... 57

United States v. Pagan, 196 F.3d 884 (7th Cir. 1999) .................. 41

United States v. Petty, 982 F.2d 1365 (9th Cir. 1993) ................. 10

United States v. Quicksey, 525 F.3d 337 (4th Cir. 1975) ............... 57

United States v. Ramirez, 347 F.3d 792 (9th Cir. 2003) ............... 15

United States v. Salameh, 152 F.3d 88 (2nd Cir. 1998) ................. 51

United States v. Sanders, 982 F.2d 4, (1st Cir. 1992) ................. 49

United States v. Silkowski, 32 F.3d 682 (2nd Cir. 1994) ................ 49

United States v. Sotelo-Rivera, 931 F.2d 1317 (9th Cir. 1991) .......... 11

United States v. Souffront, 338 F.3d 809 (7th Cir. 2003) ............... 66

United States v. Soyland, 3 F.3d 1312 (9th Cir. 1993) ................. 50

United States v. Sykes, 7 F.3d 1331 (7th Cir. 1993) ................... 49

United States v. Thomas, 355 F.3d 1191 (9th Cir. 2004) ................ 8

United States v. Turner, 898 F.2d 705 (9th Cir. 1990) ................. 10

United States v. Tzoc-Sierra, 387 F.3d 897 (9th Cir. 2004) ............ 16

United States v. Velasco-Heredia, 319 F.3d (9th Cir. 2003) ............ 8

United States v. Vest, 813 F.2d 477 (1st Cir. 1987) ................... 20

United States v. Watson, 118 F.3d 1315 (9th Cir. 1997) ................ 19

United States v. Williams, 229 F.Supp.2d (E.D. Texas 2002) ............ 45

United States v. Wilson, 160 F.3d 732 (D.C. Cir. 1998) ................ 51

MICHAEL F. SCHULZE
Defendant, pro se
Register No. 36817-048
Federal Detention Center, Honolulu
Post Office Box 30080
Honolulu, Hawaii 96820

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 02-00090-DAE |
| | ) | |
| Plaintiff, | ) | **DEFENDANT'S RESENTENCING** |
| | ) | **STATEMENT AND OBJECTIONS** |
| vs. | ) | **TO THE PRESENTENCE REPORT** |
| | ) | **OF 7/18/2003, REVISED ON** |
| MICHAEL F. SCHULZE, | ) | **8/18/2003, AND THE** |
| | ) | **ADDENDUM NO. 2 TO THE** |
| Defendant. | ) | **PRESENTENCE REPORT** |
| | ) | |

I.    **INTRODUCTION**

On march 21, 2002, Schulze was indicted along with Ralph Luther Byrd (Byrd), and Anthony Martin Tabion (Tabion), for conspiring to distribute and to possess with an intent to distribute a controlled substance, in violation of 21 U.S.C. §§ 846 and 841(a)(1), to wit: 50 grams or more of methamphetamine under § 841(b)(1)(A) - **Count 1.** All three were arrested on April 2, 2002.

On December 27, 2002, following the pleas of guilt entered by Byrd and Tabion, Schulze was charged in a Second Superceding Indictment with two additional counts of distributing a controlled substance in violation of 21 U.S.C. § 841(a)(1), to wit: 5 grams or more of methamphetamine on August 30, 2001, under § 841(b)(1)(B) - **Count 2;** and 50 grams or more of methamphetamine on October 2, 2001, under § 841(b)(1)(A) - **Count 3.**

On February 11, 2003, a jury found Schulze guilty on all three counts and on September 2, 2003, was sentenced to a term of 30 years' imprisonment. On November 28, 2005, Schulze's sentence was remanded.

-2-

## II.  **BACKGROUND**

### A.  The Trial

On January 30, 2003, Schulze's jury trial commenced where at the outset the Government informed the jury that it "can give a special verdict form when [] deliberating to find lesser amounts... [than] alleged." (RT:1-107).[1]

During trial, convicted felons Donald Grimm (Grimm), Earl Yamada (Yamada), Byrd, and Tabion, testified for the Government in exchange for a reduction in their existing sentences. (Grimm, RT:2-67); (Yamada, RT:2-130); (Byrd, RT:5-75); (Tabion, RT:5-134).

Mainly, each testified that at some point or in some way, he had been involved with Schulze in distributing methamphetamine. Grimm (RT:2-37) and Yamada (RT:2-103) testified that Schulze had shown them how to obtain, package and ship, then distribute methamphetamine; that Grimm did so from early 1998 until his arrest in April 1999 (RT:2-44); that Yamada did so from Grimm's arrest (RT:2-131) until his own arrest in July of 2000 (RT:2-91). Grimm testified he sent his packages to Tabion (RT:2-42), while Yamada sent his to his girlfriend, Susan Fukumoto (Fukumoto) (RT:2-104).

Tabion testified that he was approached once "in late '98" about receiving packages at his business and he declined, however "later on" he agreed and subsequently accepted boxes at his shop (RT:5-113, 114) from Grimm, Yamada, and Schulze (RT:5-117). Tabion stated that he did not have any contact with Schulze during the year of 2000. (RT:5-129).

Byrd testified that he was a street-level dealer who received drugs from various persons such as Grimm and Yamada (RT:5-40), but that he "quit selling dope, ... [I]n '98, somewhere probably '99." (RT:5-47).

During his testimony, Yamada stated that he became "involved in the

---

[1] RT refers to Reporter's Transcript, followed by a volume number and page number; HT refers to Hearing Transcript, followed by the page number.

methamphetamine business" on his own (RT:2-151); that he would either call his supplier or receive a call from him or "Michael" (2-97); then drive to Los Angeles (2-95); "do tests on the dope" (2-98); "bring it home [to Las Vegas] and package it up in metal containers" (2-101) and "ship it to [his] girlfriend at the veterinary hospital" in Hawaii (2-102; then fly to Hawaii to "pick up the package, weight [the drug] out... and drop it off at or wherever it was needed" (2-105); then collect the money (2-106) and fly back to Los Angeles and drop the money off to his suppliers (2-107), then continue home to Las Vegas. (RT:2-108).

During his testimony, Yamada stated that "the week before [he] got arrested", he shipped four pounds of methamphetamine to Hawaii (RT:2-115) and delivered it to the "Candy Man"; collected "about $120,000 ... and went straight [back] to Vegas... [and] gave the money to Mike." (RT:2-117). Yamada said that "a couple days later he got another call [from "Mike"] and was told to go and pick[] up whatever the [source] had." (RT:2-117, 118). Yamada stated that he went to Long Beach, obtained the drug, then on his way home to Las Vegas he "packaged it up real quick... and sent it out Fed Ex that day" to Fukumoto's working place, the Wahiawa Animal Hospital (RT:2-119, 120), then called "Mike and [told] him that everything [was] okay." (RT:2-121).

At this juncture, the Government asked Yamada whether "Exhibit Number 9, (2,458 grams of methamphetamine seized from Fukumoto on July 21, 2000) look[ed] like the substance or what the substance [he] packed up appeared to look like?" Yamada responded, "Yeah, looks like it." (RT:2-120).

Yamada also testified that he would hear from Schulze on a frequent basis and had known him "to have two phone numbers the whole time [he] knew him." (RT:2-110). However, there were no phone records of any sort to establish that Schulze ever contacted Yamada, and Yamada did not inform of any other way in which he would "hear from him on a frequent basis." (RT:2-110).

There was no evidence or witnesses to support Yamada's statements that Schulze called him, or that the quantity seized from Fukumoto was obtained on behalf of anyone other than Yamada himself. And Fukumoto declined to testify at the request of the Government, and in support of Yamada's claims.

Prior to jury deliberations, Schulze pursued the Government's suggestion for a special verdict and introduced a form that would require the jury, after a finding that he committed the general offense of violating 21 U.S.C. §§ 846 and 841(a)(1), to determine the drug quantity attributable to him.

The Government then retracted and declared that a special verdict form was "irrelevant to the jury because [the proposed quantities were] guideline levels of methamphetamine, where, basically, the jury's going to be asked whether it's going to be a level 31 or a level 32 or a level 34." (RT:7-5).

The Court then stated, "I'm not going to give that verdict form... I am going to go with the straight up guilty or not guilty, which means they would have to find him – that he possessed at least 50 grams, and then, if he gets convicted, we will argue at sentencing about the amounts, and that's the appropriate time to do it." (RT:7-6, 7).

The jury was then instructed that in order to find Schulze guilty of **Count 1**, "conspiring to distribute and possess with an intent to distribute a controlled substance in violation of Section 841(a)(1) of Title 21 of the United States Code," the Government "must prove ... there was an agreement between two or more persons to either distribute, or possess with an intent to distribute, 50 grams or more of methamphetamine... Second, Michael Schulze became a member of the conspiracy knowing of at least one of its objectives and intending to help accomplish it;" (Court's Instruction No. 24, see Exhibit "A").

With respect to **Count 2**, the jury was informed that Schulze "is charged in Count 2 of the Indictment with distribution of 5 grams or more of

-5-

methamphetamine... in violation of Section 841(a)(1) of Title 21 of the United States Code." The jury was then instructed that "[i]n order for Michael Schulze to be found guilty of either of those charges, the government must prove ... Schulze knowingly delivered 5 grams or more of methamphetamine ... and [he] knew it was methamphetamine or some other prohibited drug." (Court's Jury Instruction No. 27, see Exhibit **"B"**).

In respect to Count 3, the same instructions were read to the jury with the exception that the amount alleged was 50 grams or more of methamphetamine. (Court's Jury Instruction No. 28, see Exhibit **"C"**).

On February 11, 2003, the jury found Schulze: "AS TO COUNT 1 Guilty; AS TO COUNT 2 Guilty; [and] AS TO COUNT 3 Guilty." (Jury's February 11, 2003 Verdict Form, see Exhibit **"D"**).

B.  The Sentence

Based on the alleged amount of 105 grams of methamphetamine (50 grams in Counts 1 and 3, and 5 grams in Count 2), or, the 101 grams of methamphetamine purportedly distributed in Count 2 (48 grams), and Count 3 (53 grams), the range of punishment authorized by the jury's guilty finding is 63 to 78 months' imprisonment for an offender with no criminal history. See U.S.S.G. § 2D1.1(c)(7) (providing Base Offense Level 26 for between 50 and 200 grams of methamphetamine).[2]

On September 2, 2003, the District Court found, by a preponderance of the evidence, that the uncharged quantity of methamphetamine seized from Fukumoto and Yamada in July 2000 was attributable to Schulze, by stating,

> "The court finds, as did the jury, that Yamada
> testified truthfully during trial... the jury
> was convinced of his testimony and the
> correctness of it. And, therefore, the 2,458
> grams of ice were in fact part of the same
> course, scheme, and plan of the defendant." (HT:8 & 9).

---

[2]  Neither Indictment in this case mentioned a specific drug quantity.

The Court determined that based on the attribution of the additional 2,458 grams, that the appropriate Base Offense Level should be 38. The Court then determined that Schulze was a leader or organizer of a criminal activity involving 5 or more persons, and increased his Base Offense Level to 42. And following these findings, the Court imposed a sentence of 360 months', i.e., 30 years, imprisonment. The Court also imposed a $50,000 fine.

C.  The Appeal

Schulze appealed and argued that the District Court violated the Sixth Amendment by enhancing his sentence beyond the statutory maximum authorized by the jury's verdict, as articulated in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348 (2000); and Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531 (2004).

While Schulze's appeal was pending, the Supreme Court issued its ruling in United States v. Booker, 125 S.Ct. 738 (2005), which held that a judge violates the Sixth Amendment when imposing an enhanced sentence based on extra-verdict findings under the mandatory regime of the United States Sentencing Guidelines (U.S.S.G.). As a remedy, the Court severed the provision that mandates a sentencing judge impose a term within a specified Guideline range.

To this end, the Government responded to Schulze's appeal by stating,

> "the District Court erred by making factual findings which increased Schulze's maximum sentence beyond that justified by the jury's verdict. At the sentencing hearing, the court made factual findings related to drug weight that went beyond the jury's findings of 50 grams or more of methamphetamine as charged in Counts 1 and 3. The Court also found that Schulze was a organizer or leader of criminal activity involving 5 or more persons. Based on this finding, Schulze's offense level increased by four levels." (Brief of Appellee, at 9 & 10).

Booker's new rule was held to apply to all cases on direct review, and

accordingly Schulze was remanded by the Ninth Circuit Court of Appeals on November 28, 2005, for resentencing.

### III.    PROCEDURE ON REMAND

In resentencing a defendant, the district court is permitted to take a fresh look at the relevant facts and the Guidelines consistent with Booker, the Sentencing Reform Act of 1984, and Rule 32 of the Federal Rules of Criminal Procedure. United States v. Ameline, 409 F.3d 1073 (9th Cir. 2005) (en banc). Where a sentence is based on a specific quantity of drug, failure to elicit a drug quantity finding from the jury during trial cannot be corrected by a quantity determination on remand (United States v. Thomas, 355 F.3d 1191, 1202 (9th Cir. 2004)), and the court may not empanel a jury to determine quantity following a conviction that has become final. United States v. Banuelos, 322 F.3d 700, 706 (9th Cir. 2003).

When the Government has lost its opportunity to prove drug quantity to a jury beyond a reasonable doubt, the conviction for a conspiracy to distribute an unspecified amount of that controlled substance must stand, and the defendant shall be sentenced accordingly. United States v. Velasco-Heredia, 319 F.3d 1080, 1086-87 (9th Cir. 2003). And where a quantity of methamphetamine is neither charged in the indictment, nor submitted to a jury and proven beyond a reasonable doubt, the court must impose a sentence under the default penalty provision of 21 U.S.C. § 841(b)(1)(C). United States v. Jordan, 291 F.3d 1091, 1095 (9th Cir. 2002)(remanding for resentencing for an unspecified amount of methamphetamine); Thomas, 355 F.3d at 1202 (Defendant resentenced under § 841(b)(1)(C), where quantity of methamphetamine was not proved to the jury beyond a reasonable doubt).

### IV.    STATUTORY SENTENCING

Under a conviction for violating 21 U.S.C. § 841(a)(1), the statutory mandatory minimum sentence under § 841(b) are not triggered unless and until

a jury has found, beyond a reasonable doubt, the quantity of a controlled substance. United States v. Labrada-Bustamante, 428 F.3d 1252, 1262 (9th Cir. 2005)(citing United States v. Valasco-Heredia, 319 F.3d 1080, 1086 (9th Cir. 2003)(stating that after Apprendi, the statutory minimum sentence under 21 U.S.C. § 841 do not apply "until the jury, or the court in a bench trial, finds beyond a reasonable doubt [] the quantity involved in the violation.")

In order to establish the appropriate penalty provision under 21 U.S.C. § 841, drug type and quantity must be charged in the indictment, submitted to a jury, and proved beyond a reasonable doubt. United States v. Buckland, 289 F.3d 558, 568 (9th Cir. 2002)(en banc). And where a drug quantity finding exposes a defendant to a higher statutory maximum than he would otherwise face, the findings must be made by the jury beyond a reasonable doubt. United States v. Banuelos, 322 F.3d 700, 702 (9th Cir. 2003).

When the government seeks an enhanced sentence under the aggravated penalty provision of § 841(b)(1)(A) or - (b)(1)(B), drug type and quantity must always be pleaded and proven to a jury. If a defendant is convicted only on a lesser unquantified drug charge, he must be sentenced pursuant to Section 841(b)(1)(C). United States v. Gonzalez, 420 F.3d 111, 131 (2nd Cir. 2005). The penalties provision of § 841(b)(1)(C) prescribes a zero minimum to twenty-year maximum for an offense involving an unspecified quantity of Schedule I and II controlled substances. See 21 U.S.C. § 841(b)(1)(C)(2006).

## V.    GUIDELINE SENTENCING

Although the Supreme Court in Booker effectively made the Guidelines "advisory", a sentencing court is still required to utilize them when applicable in determining the appropriate range of punishment. United States v. Cantrell, 433 F.3d 1269, 1280 (9th Cir. 2006).

Pursuant to U.S.S.G. § 2D1.1(c)(7), 50 to 200 grams of methamphetamine corresponds to a Base Offense Level of 26. Level 26 in Criminal History

Category I, prescribes a term of 63 to 78 months' imprisonment.

## VI.    STANDARD OF PROOF

The Government bears the burden of proof to establish the factual predicate for the court's base offense level determination, as well as all factors that serve to increase the defendant's sentence.  United States v. Howard, 894 F.2d 1085, 1089-90 (9th Cir. 2000).  A court may rely on undisputed statements in the presentence report at sentencing; however, when a defendant challenges the information contained in the presentence report, the court is obligated to resolve the factual dispute, and must make written findings of fact concerning the disputed matter which it relies upon in sentencing.  United States v. Gutierrez-Hernandez, 94 F.3d 582, 584 (9th Cir. 1996)(quoting United States v. Turner, 898 F.2d 705, 709 (9th Cir.), cert. denied, 495 U.S. 962, 110 S.Ct. 2574, 109 L.Ed.2d 756 (1990).

Generally, statements made by an accomplice may be used in sentencing; however, a defendant clearly has a due process right not to be sentenced on the basis of materially incorrect information.  And where such statements are considered, there must be "some minimal indicia of reliability" accompanying a statement.  United States v. Huckins, 53 F.3d 276, 279 (9th Cir. 1995) (quoting United States v. Petty, 982 F.2d 1365, 1369 (9th Cir. 1993), cert. denied, — U.S. —, 114 S.Ct. 683, 126 L.Ed.2d 650 (1994).  Statements not made under oath, or where there is no extrinsic evidence to support them are unreliable.  Huckins, 53 F.3d at 279; see also Lee v. Illinois, 476 U.S. 530, 546, 106 S.Ct. 2056, 2065, 90 L.Ed.2d 514 (1986)(reiterating "the time-honored teaching that a co-defendant's confession inculpating the accused is inherently unreliable").  "The fact that a statement is self-inculpatory does not make it more reliable; but the fact that a statement is collateral to a self-inculpatory statement says nothing at all about the collateral statement's reliability."  Williamson v. United States, — U.S. —, —, 114

S.Ct. 2431, 2435, 129 L.Ed.2d 476 (1994).

The Fifth Amendment requires proof beyond a reasonable doubt, not by a preponderance of the evidence, of any fact that increases the sentence beyond what could have been lawfully imposed on the basis of facts found by the jury. Booker, 125 S.Ct. at 749, n.6 (Thomas, J., dissenting). And under Title 21 U.S.C. § 841, drug type and quantity are sentencing factors that must be submitted to a jury and proven beyond a reasonable doubt in order to satisfy either aggravated penalty provision of § 841(b)(1)(A) or -(b)(1)(B). Buckland, 289 F.3d at 568. See also United States v. Cernobyl, 255 F.3d 1215, 1218 (10th Cir. 2001)("in order to increase a defendant's sentence for a conviction pursuant to § 841, drug quantities must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt."); Banuelos, 322 F.3d at 1195 (same).

## VII.  RESENTENCING STATEMENT

Prior to Apprendi (2000), Ninth Circuit precedent clearly held that drug quantity was not an element of conspiracy to distribute a controlled substance and could be proved for sentencing purposes by a preponderance of the evidence. See e.g., United States v. Sotelo-Rivera, 931 F.2d 1317, 1319 (9th Cir. 1991). The usual course of trial was not to determine drug quantity until sentencing. A district court's procedural approach to this issue and use of the preponderance standard to determine the amount of drugs attributable to the defendant was fully in accord with controlling Ninth Circuit law.

Following Apprendi, however, the Ninth Circuit determined that drug quantity was a factor that can increase the maximum penalty to which a defendant is subject, and required that when the Government seeks an enhanced penalty based on the amount of drugs under §841(b)(1)(A) or -(b)(1)(B), to state the drug quantity in the indictment and to submit the

question of drug quantity to a jury for a finding of proof beyond a reasonable doubt. Buckland, 289 F.3d at 568.

The Buckland court held that Congress structured § 841 in two parts, with 841(a) defining the Unlawful Acts (possessing or distributing a controlled substance), and 841(b) providing a range of punishment under the Penalties provision, which is based on the quantity and type of controlled substance found by the jury. Buckland, 289 F.3d at 566 and 573 (Hug, Circuit Judge, Concurring and Dissenting). The majority in Buckland defined that § 841(a) pertained to the offense charged (element), and that § 841(b) pertained to sentencing (factors). Buckland, 289 F.3d at 566.

Accordingly, in a controlled substance trial where the Government seeks an enhanced penalty under § 841(b)(1)(A) by alleging "50 grams or more of methamphetamine", a jury's task is twofold – it must first determine that the defendant committed the general offense of possessing or distributing a controlled substance, then, if the jury finds the defendant guilty, it must determine the type and quantity of the drug attributable to the defendant.

In the instant matter, the Government sought enhanced penalties under 841(b)(1)(A) and (B), and pursuant to Buckland, Schulze was entitled to submit a special verdict form requiring the jury to make drug type and quantity findings following the general verdict – a request the Government objected to and of which the Court denied. Consequently, the jury was improperly instructed to find that Schulze: (1) committed the general offense of possessing or distributing a controlled substance (841(a)(1)); (2) knowingly delivered 50 grams or more of methamphetamine (841(b)(1)(A)); (3) knew it was methamphetamine **or** (4) **some other prohibited drug.** (Court's Jury Instruction No. 28, Exhibit **"C"**).

With respect to Count 1, the jury was only required to find that "two or more persons" agreed to either distribute, or possess 50 grams or more of

question of drug quantity to a jury for a finding of proof beyond a reasonable doubt. Buckland, 289 F.3d 568.

Congress structured Section 841 in two parts, with 841(a) defining the Unlawful Acts (possessing or distributing a controlled substance), and 841(b) providing a range of punishment under the Penalties provision, which is based on the quantity and type of controlled substance found by the jury. Buckland, 289 F.3d at 566 and 573 (Hug, Circuit Judge, Concurring and Dissenting).

Accordingly, in a trial where the Government seeks an enhanced penalty under § 841(b)(1)(A) or (B) by alleging 5 or 50 grams or more of methamphetamine, a jury's task becomes twofold - it must first determine whether the accused committed the unlawful act of possessing or distributing a controlled substance under § 841(a)(1), then, if guilty, the jury must also make a separate finding as to the type and quantity of the controlled substance attributable to the offender. Buckland, 289 F.3d at 568.

When quantity is not proven beyond a reasonable doubt, the Government has not met its burden of proof and subsequently a defendant cannot be exposed to a higher statutory maximum under an aggravated penalty provision. Thomas, 355 F.3d at 1201 (finding that defendant possessed 50 grams or more of methamphetamine under § 841(b)(1)(A) without proof was clear error); see also Jordan, 291 F.3d at 1097 (remanding for resentencing for an unspecified amount of methamphetamine under § 841(b)(1)(C) after jury trial in which drug quantity was not proved beyond a reasonable doubt).

In the instant case, the Government sought enhanced penalties under § 841(b)(1)(A) and (B), and in accordance to the precedent established by Buckland, the Government was required, or at least Schulze was entitled, to submit a special verdict form requiring the jury to determine drug type and quantity following the general verdict - a request Schulze made, but one that the Government objected to and of which the Court subsequently denied.

Consequently, the verdict in this case only demonstrates that the jury found Schulze guilty of committing the general offense of possessing or distributing a controlled substance, as charged under § 841(a)(1) in Counts 1, 2, and 3.  No finding of facts were made in respect to drug type and quantity, i.e., whether "Schulze knew that [the controlled substance] was methamphetamine **or some other prohibited drug.**"  (Court's Jury Instruction Nos. 27 & 28, Exhibits **"B"** & **"C"**)(emphasis added).

With respect to Count 1, Schulze was charged with "Conspiring to distribute and possess with an intent to distribute a controlled substance in violation of Section 841(a)(1) of Title 21 of the United States Code."  The jury may have been instructed to find "two or more persons [agreed] to either distribute, or possess ... 50 grams or more of methamphetamine," and that Schulze "became a member of the conspiracy ..."  (Court's Jury Instruction No. 24, Exhibit **"A"**).  However, the jury did not make a finding that Schulze himself possessed or distributed 50 grams or more of methamphetamine.  In fact, there was no determination made that the alleged conspiracy involved methamphetamine at all.

Without the jury's explicit drug type and quantity determination, the Government has not met its burden of proof required to satisfy the aggravated drug penalty provision under § 841(b)(1)(A) or (B), and therefore cannot legally enhance Schulze's sentence beyond the range established by the jury's verdict.  And when considering the fact that the jury was specifically instructed that the alleged offense(s) involved "methamphetamine or some other prohibited drug", and that Schulze's request to submit a special verdict form that would allow the jury to make that finding was denied, there is no evidence to suggest which controlled substance the jury found Schulze guilty of possessing or distributing.  And accordingly, there is no proof or legal justification for imposing a sentence above the minimum provided under the

penalty provision of § 841(b)(1)(D)(3), which provides: "In the case of a controlled substance in schedule V, such person shall be sentenced to a term of imprisonment of not more than one year." 21 U.S.C. § 841(b)(1)(D)(3).

It cannot be speculated what type of controlled substance the jury may have found because a reference was made to **"or some other prohibited drug"**. "To hypothesize a verdict that was never in fact rendered – no matter how inescapable the findings to support the verdict might be – would violate the jury trial guarantee." Sullivan v. Louisiana, 508 U.S. 275, 280 (1993). The right to render the verdict in a criminal prosecution belongs exclusively to the jury. Neder v. United States, 538 U.S. 1, 38-39 (1999)(citing Sullivan, 508 U.S. 275). And a judge's role in sentencing is constrained at its outer limits by the facts alleged in the indictment and found by the jury. Apprendi, 530 U.S. at 483, n.10.

Buckland's holding was issued a year prior to Schulze's jury trial, and thus Schulze's right to a jury's determination on drug type and quantity was well established. Therefore, it was clear error for the Government to oppose and the Court to deny his request for a drug type and quantity finding. And because of the significant difference in terms of imprisonment between possessing or distributing "methamphetamine" **or** "some other prohibited drug", imposing a sentence that is based on methamphetamine when the jury made no such finding, would affect Schulze's substantial rights because the statutory maximum for methamphetamine is twenty (20) years under § 841(b)(1)(C), whereas for "some other prohibited drug" the statutory maximum is one year. And because Schulze was deprived his right to a penalty determination under Buckland, the rule of lenity requires Schulze to receive the lesser of the penalties provided by the statute for which he was found guilty of offending. See United States v. Ramirez, 347 F.3d 792, 799-800 (9th Cir. 2003); United States v. Bass, 404 U.S. 336, 227-48 (1971).

-15-

Accordingly, the statutory maximum term of imprisonment Schulze can receive for possessing or distributing a controlled substance under 21 U.S.C. § 841(a)(1), is a period of not more than one year for an offense involving "some other prohibited drug", pursuant to § 841(b)(1)(D)(3).

## VIII. SPECIFIC OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT

**Page 3:**  There is no evidence to support the implication that Schulze relied on or utilized the alias names Alan Banks or Michael Dannon.  The information provided by a probation officer in a presentence investigation report must be based on some sort of specific evidence and not just conjecture or speculation on the part of the officer.  U.S. v. McMeen, 49 F.3d 225 (6th Cir. 1995); see also U.S. v. Navarro, 979 F.2d 786, 788 (9th Cir. 1992).  Accordingly, use of alias names must be proved or stricken.

**Pages 4 & 5:**  Prior records of co-defendants Ralph Luther Byrd and Anthony Martin Tabion, as well as defendants Donald Allen Grimm, Earl Yamada, and Susan Fukumoto, must be provided in this report.  Title 18 U.S.C. § 3553(a)(6) requires that a sentencing court consider, "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." This cannot be done in the instant case without considering the prior records of the persons who were convicted for the same conduct as Schulze.  Also, information pertaining to the term if imprisonment each named above actually served must be provided to support a comparison under a sentencing disparity issue.  See U.S. v. Tzoc-Sierra, 387 F. 3d 897 (9th Cir. 2004)(departure based on disparity in sentence received by co-defendants); U.S. v. Daas, 198 F. 3d 1167, 1180-81 (9th Cir. 1999)(same).

**¶12:**  Neither of the debriefing statements made by Yamada and described in this paragraph are reliable.  Statements that are not made under oath or subject to cross-examination are presumed unreliable.  Lee v. Illinois, 476

U.S. 530 (1986). In addition, the statement that Yamada "distributed the drugs to other sub-distributors including Anthony Tabion" is unsupported. No part of any text from Yamada's trial testimony indicates he distributed drugs to Tabion, in fact, Tabion testified that his only role in the offense during the period involving Yamada was receiving packages - not distributing them. (RT:5-117). Moreover, the statement that Yamada "admitted that the 'ice' seized from Fukumoto's place of business was supplied to him by Schulze" is unsupported. At trial, Yamada testified that the quantity seized from Fukumoto was obtained from "Gus ... in Long Beach somewhere at a Starbucks coffeehouse." (RT:2-118). Furthermore, Yamada testified that when he picked up the drugs in Long Beach, he had "no idea" where Schulze was; that he could have been in Florida. (RT:2-147). And finally, there are no facts or evidence upon which to base any statement made by Yamada. Even if the court were to rely on his testimony, additional facts must be presented to support a finding that Schulze "supplied" ice to Yamada. See U.S. v. MacDonald, 992 F.2d 960, 967 (9th Cir. 1993)(remanding for resentencing where no additional facts supported testimony of co-defendant). Accordingly, unless supported by additional facts or evidence, statements provided by Yamada must be stricken from this report.

¶13: The "CI" in this case is Steven Polonco Olaes (Olaes). As a defense witness during trial, Olaes admitted that he lied to federal investigators during his stint as a paid informant (RT:6-142), and that he consumed methamphetamine on a weekly basis which "affected his judgement." (RT:6-144). Accordingly, any information provided by Olaes that is unsupported by additional facts or evidence must be stricken from this report.

¶14: No evidence exists to prove "the CI [Olaes] met with Schulze in a hotel room in Honolulu, Hawaii", or that Schulze "fronted" Olaes methamphetamine. Furthermore, there is no proof that Schulze was even in

Hawaii on 8/30/2001. There were no witnesses or surveillance of the alleged meeting (RT:4-64), and Olaes admitted to deceiving federal investigators (RT: 6-141) and consuming methamphetamine throughout his participation (RT:6-140). Accordingly, the statements contained in this paragraph are unsupported and must be stricken from this report.

In regard to the alleged "recorded telephone call to Schulze which confirmed the earlier drug transaction and the amount of money owed for the drugs", no such utterance occurred. Moreover, the recordings made by Olaes between August 17, 2001, and October 5, 2001, were illegally obtained under Title 18 U.S.C. §§ 2511(2)(d) and 2515, because he was not authorized by state or federal authorities to participate as an informant (RT:3-19) until his probation expired on October 5, 2001 (RT:4-67), and in fact was not authorized to commit Tier II unlawful activity (purchasing contraband) until October 22, 2001. (See page 3, Exhibit **"E"**). Furthermore, no evidence exists to support any claim that Schulze was identified as a party to the recording on this date.

In regard to the weight and purity of the substance reported here to have been "fronted" to Olaes, as a defense witness, Olaes testified that prior to contacting and delivering a substance to FBI, he tampered with and thereby compromised the reliability of the evidence. (RT:6-141). Tangible evidence of Schulze's alleged distribution can only be admissible when shown to be in substantially the same condition as when the crime was committed. Gallego v. U.S., 276 F.2d 914, 917 (9th Cir. 1960); see also U.S. v. Godoy, 528 F.2d 281, 283 (9th Cir. 1975)(per curiam). Because the Government cannot show the substance is in its original state, the weight and purity reported are therefore unreliable and must be stricken. Furthermore, as a matter of law, because Olaes committed unlawful activity (purchasing contraband) without state or federal authority on August 30, 2001, the 48 grams were illegally

obtained and are therefore inadmissible. U.S. v. Watson, 118 F.3d 1315, 1319
(9th Cir. 1997)(citing U.S. v. Havens, 446 U.S. 620, 628 (1980); see also
Burdeau v. McDowell, 256 U.S. 465, (1921)(the exclusionary rule provides that
evidence illegally obtained by private actor cannot be admitted as evidence).

¶15:   No evidence exists to support the statements contained in this
paragraph and accordingly must be stricken from this report pursuant to U.S.
v. Navarro, 979 F.2d at 788.

¶16:   No evidence exists to support the statement that when Olaes asked
Tabion if he could purchase methamphetamine from him that Tabion "responded
that the transaction would have to be prearranged with Schulze." A review of
the transcript reveals no such utterance. Accordingly, this statement must be
stricken pursuant to U.S. v. Navarro, 979 F.2d at 788.

¶17:   No evidence exists to prove that Olaes "provided Schulze with
$1,800 to pay for the remaining portion of methamphetamine 'fronted' by
Schulze on 8/30/2001/." There is no proof Schulze fronted anything to anyone
on 8/30/2001. To the extent statements contained in this paragraph are based
on information provided by Olaes, as a defense witness Olaes testified to
deceiving federal investigators (RT:6-141) and consuming methamphetamine on a
weekly basis throughout his participation (RT:6-140), and he is therefore an
unreliable source. And to the extent Olaes may have recorded conversations on
9/20/2001, any recordings he made prior to October 5, 2001, were illegally
obtained pursuant to 18 U.S.C. §§ 2511(2)(d) and 2515, because he was not
acting under the color of law for lack of Government direction, as required
under 18 U.S.C. § 2511(2)(c), and his assent to record private conversations
was a subterfuge to obtain free money and drugs, and he used the information
he intercepted to further his criminal objectives. All in violation of
federal law. See Sussman v. American Broad. Cos. Inc., 186 F.3d 1200, 1202
(9th Cir. 1999). Accordingly, information received through unlawful means

-19-

such as an illegal interception of wire or oral communications, cannot, under the exclusionary rule, be relied upon in a criminal proceeding or introduced into evidence. <u>Burdeau v. McDowell</u>, 256 U.S. 465 (1921). Consequently, any statements contained in this presentence report that are based on information provided by Olaes orally or through electronic means, must be stricken from consideration and this report.

¶18: No evidence exists to prove that Olaes "received a ziplock bag containing two ounces of methamphetamine from Schulze while at Schulze's mother's residence in Ewa Beach, Hawaii (Count 3)." There were no witnesses or surveillance of the alleged meeting, and there is no proof Schulze was in Hawaii on 10/2/2001. To the extent this alleged meeting is based on information provided by Olaes, as a defense witness Olaes admitted to deceiving federal investigators (RT:6-141) and consuming methamphetamine throughout his participation which affected his judgement. (RT:6-140). Accordingly, information provided from Olaes is unreliable and therefore all statements derived from him as a source must be stricken.

To the extent this paragraph is based on information derived from conversations Olaes may have taped, or those in which Olaes may have transmitted - Olaes was not authorized to conduct unlawful activity (purchasing contraband) until October 22, 2001 (Exhibit "E"), yet considering he purportedly did so on October 2, 2001, which was clearly in violation of state and federal drug laws, any recordings Olaes may have made during the unlawful drug transaction are illegal because they were obtained during the commission of unauthorized criminal activity. <u>Chandler v. U.S. Army</u>, 125 F.3d 1296, 1302 (9th Cir. 1997)(endorsing the reasoning in <u>U.S. v. Vest</u>, 813 F.2d 477 (1st Cir. 1987), that suppression of conversations is required where the recordings were made by a private party during the commission of unlawful activity). Accordingly, illegally obtained evidence is not admissible and

must be stricken from consideration and this report. Especially in light of the fact that Olaes admitted to other criminal acts he committed during the recordations, where he stole drugs from the FBI on approximately six (6) occasion (RT:4-105), including October 2, 2001 (RT:4-61). In addition, no evidence exists to prove that either voice of any conversation recorded or transmitted by Olaes is that of Schulze.

In regard to the weight and purity of the substance reported here to have been "received" by Olaes, as a defense witness Olaes admitted that prior to delivering a substance to FBI on October 2, 2001, he tampered with and thereby compromised the reliability of the evidence. (RT:6-141). Tangible evidence of Schulze's alleged distribution can only be admissible when shown to be in substantially the same condition as when the crime was committed. Gallego v. U.S., 276 F.2d 914, 917 (9th Cir. 1960); see also U.S. v. Godoy, 528 F.2d 281, 283 (9th Cir. 1975)(per curiam). Because the Government cannot show the substance is in its original state, the weight and purity reported are therefore unreliable and must be stricken from consideration and this report. Furthermore, as a matter of law, because Olaes committed unlawful activity (purchasing contraband) on October 2, 2001, without state or federal authority, he was not acting under the color of law and therefore the 53 grams were illegally obtained and are inadmissible. U.S. v. Watson, 118 F.3d 1315, 1319 (9th Cir. 1997)(citing U.S. v. Havens, 466 U.S. 620, 628 (1980); see also Burdeau v. McDowell, 256 U.S. 465 (1921)(evidence illegally obtained by private actor cannot be admitted into evidence). Accordingly, the substance received from Olaes on October 2, 2001, is not admissible.

No evidence exists that "[O]n 10/4/2001, Schulze instructed [Olaes] to pay Tabion $2,000 for one of the ounces of methamphetamine." To the extent this statement is derived from a recording provided by Olaes, all recordings made prior to October 22, 2001, are illegal and therefore inadmissible. In

addition, no evidence exists to prove Schulze was a party to any communication recorded by Olaes.

In regard to statements referenced in paragraph 18 that pertain to the purported events occurring between Olaes and Tabion, to the extent information was obtained through Olaes' statements or recordings he may have made, he admitted to deceiving federal investigators and consuming methamphetamine, and he admitted to stealing drugs from the FBI. Olaes is therefore an unreliable source upon which to base any information. And to the extent Olaes recorded the alleged meeting, he was not authorized to do so until October 22, 2001, and because he admitted to conspiring with Tabion on this date to distribute methamphetamine (RT:4-85), and that he accepted three grams of methamphetamine from Tabion to "show to potential buyers" and "used a little bit" (RT:4-61), all without the knowledge and authorization of federal investigators, any recordings Olaes may have made on October 4, 2001, were not under the color law and are therefore illegal and inadmissible. Accordingly, no evidence exists to support any statement contained in paragraph 18 and consequently must be stricken from consideration and this report.

¶19:  No evidence exists to support the statements contained in this paragraph. To the extent information was provided by Olaes or through transmissions or recordings Olaes may have provided, the facts and evidence recited by Schulze throughout this pleading clearly demonstrates Olaes as an unreliable source, and that any recordings made prior to October 22, 2001, were illegally obtained. In addition, Olaes specifically admitted to stealing drugs from the FBI on 10/13/2001 (RT:4-57), and this criminal act alone makes any recordings made during an authorized drug transaction illegal. And it also renders the weight and purity of the controlled substance unreliable because Olaes admittedly tampered with the evidence, and accordingly it is

not admissible.  In any event, paragraph 46 of Schulze's presentence report states that "there is insufficient evidence to establish that the 'ice' [that Olaes purchased from Tabion] was actually provided by [Schulze]." Accordingly, paragraph 19 is not only unsupported, the events claimed to have occurred have absolutely no bearing on the instant matter and are irrelevant to Schulze and his case.  Consequently, paragraph 19 must be struck from consideration and this report.

¶20:  The statements contained in paragraph 20 are unsupported.  To the extent any statements are based on information provided by Olaes, he admittedly deceived federal investigators during his participation and his judgement was altered through the consumption of methamphetamine throughout the course of his assistance.  There is no support to the statement that "[B]etween 10/18/2001 and 10/22/2001, [Olaes] met with Byrd at his residence [where] Byrd informed [Olaes] that he had distributed between 15 to 20 pounds of methamphetamine for Schulze and was **currently distributing the drug** (emphasis added) to help Schulze pay off a debt with his drug sources."  In fact, Byrd's testimony was that he "quite selling dope, ... [I]n '98, somewhere probably '99." (RT:5-47). Such a statement is inconsistent with Byrd's sworn testimony.  Also, there is no evidence to support the statement that Byrd "loaned Schulze $100,000 to build a home in Las Vegas, and allowed Schulze to give his debtors a boat owned by Byrd."  There is no evidence Byrd ever owned a boat or that he ever loaned anyone money.  There are no documents, pictures, witnesses, etc.

As for the alleged drug transactions between Olaes and Byrd, where it is stated that Byrd "indicated that the methamphetamine he provided to [Olaes] was obtained from Schulze", here again there is an inconsistency between this statement and Byrd's testimony where he swore at trial that he quite selling dope somewhere in 1999.  (RT:5-47).  There is absolutely no evidence to support Byrd's statement, and this fact is also reflected in paragraph 46 of

Schulze's presentence report, where it is found that the quantity of "ice" purchased by Olaes from Byrd was not supplied by Schulze, stating that "there is insufficient evidence to establish that the 'ice' was actually provided by the defendant." Accordingly, paragraph 20 is not only unsupported, the events claimed to have occurred have no bearing on the instant matter and are irrelevant to Schulze and his case. Byrd testified he was not guilty of conspiring with anyone, but that he "[S]old to Steve Olaes three times." (RT: 5-31). Because Byrd's criminal conduct is not connected to Schulze, paragraph 20 must be stricken from consideration and this report.

¶21: No evidence exists to support the statements contained in paragraph 21. There are no recordings, witnesses, surveillance, etc., and Olaes admitted to deceiving federal investigators and consuming methamphetamine throughout his participation which affected his judgement. (RT:6-140). Moreover, Olaes admitted to stealing drugs from the FBI (RT:4-57) and committing numerous other criminal acts (RT:4-85), his credibility is therefore destroyed and consequently cannot support any statements in this presentence report. Accordingly, paragraph 21 must be stricken from consideration and this report.

¶22: No evidence exists to connect the activities that are alleged to have occurred between Olaes and Byrd to Schulze. In addressing the statement that "Byrd indicated [during debriefings] that the methamphetamine he provided to [Olaes between 11/1/2001 and December 2001] was obtained from Schulze", this is entirely inconsistent with the sworn testimony given by Byrd during trial, where he stated that "in '98, probably '99, ... when I quit selling dope, when I stopped doing business with [Schulze]." (RT:5-47). There is absolutely no evidence to support the suggestion that Schulze supplied Byrd with the controlled substance he sold Olaes, and this fact is also recognized in paragraph 46 of Schulze's presentence report, where it is stated that

"there is insufficient evidence to establish that the 'ice' [purchased by Olaes from Byrd] was actually provided by the defendant."  Accordingly, the statements provided by Byrd are unsupported and the events contained in paragraph 22 are irrelevant to Schulze.  Consequently, paragraph 22 must be struck from consideration and the presentence report.

¶23:  No evidence exists to connect the activities that are alleged to have occurred between Olaes and Byrd to Schulze.  For the same reasons explained above in response to paragraph 22, paragraph 23 must also be struck from consideration and the presentence report.

¶24:  No evidence exists to support the statements contained in paragraph 24.  There are no recordings, surveillance, or corroboration of any kind.  And considering the fact that Olaes admitted to lying to federal investigators and consuming methamphetamine which affected his judgement, he is not a credible source upon which to base any statements without support.  See U.S. v. Petty, 982 F.2d 1365, 1369 (9th Cir. 1993)(court may consider hearsay statements as long as they are accompanied by some indicia of reliability).  Accordingly, paragraph 24 must be stuck from the report.

¶25:  No evidence exists to support the statements contained in paragraph 25, or connect the activities that are alleged to have occurred between Olaes and Byrd to Schulze.  For the same reasons explained above in response to paragraphs 22 and 24, paragraph 25 is unsupported and irrelevant and must therefore be struck from consideration and the presentence report.

¶26:  No evidence exists to support the statements contained in paragraph 26.  And to the extent information is derived from recorded calls, there is no evidence to support the suggestion that Schulze was a party to any recording.  Accordingly, paragraph 26 must be struck from consideration and the presentence report.

¶27:  No evidence exists to support the statements contained in

-25-

paragraph 27.  In addition, the items claimed to have been "recovered" have

no significance to the instant matter and were not objects illegal to possess.

Accordingly, paragraph 27 must be struck from consideration and the

presentence report.

¶28:  No evidence exists to support the statements contained in

paragraph 28.  Confessions made by an accused co-defendant is presumed

unreliable, even if the co-defendant's confession and that of the accused

overlap or "interlock" in their factual recitations to a great extent.  Lee v.

Illinois, 476 U.S. 530 (1986).  Post arrest statements made by an accomplice

are not reliable unless accompanied by some "indicia of reliability."  U.S. v.

Huckins, 53 F.3d 276, 279 (9th Cir. 1995).  The information provided in

paragraph 28 is not based on statements uttered by Tabion during trial, in

fact, they appear to be alarmingly dissimilar.  For example, Tabion did not

state that "in late 1998, he agreed to accept packages of methamphetamine at

the Rod Shop...", rather, he stated that he was "approached once, like, late

'98, [but] I told him no."  (RT:5-113).  Upon close examination, Tabion's

testimony does not indicate at all precisely at what point in time he did

actually receive the first package, but he did state that "later on we had

some hard times... [A]nd he said I could easily make a lot of money accepting

these boxes."  (RT:5-113).  The period of Tabion's participation is a critical

element of the alleged conspiracy because Grimm testified that he sent Tabion

packages in January of 1998.  (RT:2-44).  There can be no way to determine

what "later on" meant, it could be that Tabion did not receive packages until

1999.  Without some "indicia of reliability", i.e., delivery receipts, etc.,

assuming a period in time would be nothing more than speculation.

Another example, Tabion testified that he "never opened the boxes" (RT:

5-116).  It would therefore be hearsay for Tabion to state that he accepted

"packages of methamphetamine", because he did not have first-hand knowledge of

what the packages contained.  Tabion testified that his "role was simply to receive the Fed Ex and UPS packages... and hold [them] until somebody came to pick them up." (RT:5-131).  Tabion gave no testimony to having seen the contents of any package he claimed to have received, and there is no evidence that supports the contention that any of the alleged packages actually contained methamphetamine.  Tabion's assumptions are therefore based on secondhand information – hearsay.  And while a sentencing court may consider hearsay statements, they must be accompanied by "some minimal indicia of reliability." U.S. v. Petty, 982 F.2d 1365, 1369 (9th Cir. 1993).  Here, there is no indicia of reliability in Tabion's hearsay statements or other claims, and consequently paragraph 28 must be stuck from consideration and the presentence report.

¶29:  No evidence exists to support the statements contained in paragraph 29.  There is no evidence that Tabion ever received packages at "the Rod Shop" or anywhere, let alone in July of 1999.  In addition, Tabion swore during trial that he never opened any of the packages (RT:5-116), it would be impossible for Tabion to have known what the alleged "test package" contained, let alone that it "contain[ed] one pound of 'ice'", if he never observed its contents.  Such a statement is therefore pure conjecture and speculation, or in any event – hearsay.  And as required by the Supreme Court and the Ninth Circuit, an unsupported hearsay statement made by a co-defendant is presumed unreliable unless there is some indicia of reliability.  See Lee v. Illinois, 476 U.S. 530 (1986); and Huckins, 53 F.3d 276 (9th Cir. 1995).  Moreover, for Tabion to have determined that the substance contained in the July 1999 "test package" was in fact "one pound of 'Ice'", he would had to have weighed it and perform a chemical test to determine the purity exceeded 80%.  Tabion did not testify to these facts, and accordingly paragraph 29 must be struck from consideration and the presentence report.

¶30:  No evidence exists to support the statements contained in paragraph 30.  Moreover, a number of statements completely contradict Tabion's trial testimony.  For example, at trial, Tabion swore that he "never opened the boxes."  (RT:5-116).  Yet here it states that "after 9/11/2001, [Tabion] began to open the packages..."  At trial, Tabion swore that his "role was simply to receive the Fed Ex and UPS packages ... and hold it until somebody came to pick it up."  (RT:5-131).  Yet here it states that "Tabion separated the methamphetamine into smaller quantities and packaged them for distribution."  It is also stated that Tabion "distributed [one pound and 10 ounces] to associates of Schulze."  Yet at trial Tabion did not testify to distributing anything to anyone other than providing Olaes with an envelope on two occasions.  (RT:5-125, 126).  In fact, Tabion was only charged with distributing 26.4 grams of methamphetamine to Olaes on October 13, 2001 - the only known and recorded transaction in this investigation involving Tabion - which, was subsequently dismissed by the Government in exchange for Tabion's testimony.  (RT:5-136).  The statements contained in paragraph 30 are unsupported, and for the same reasons expressed and articulated above in response to paragraphs 27, 28, and 29, paragraph 30 must be struck from consideration and the presentence report.

¶31:  No evidence exists to support the statements contained in paragraph 31.  Moreover, it is pure speculation to state that any of the suggested items were to "help facilitate the receipt and distribution of methamphetamine and drug proceeds."  Not a single item described here is illegal to possess, and there is no evidence to prove that these items were used to "facilitate" any criminal offense.  A presentence investigation report must be based on some sort of specific evidence and not just conjecture and speculation on the part of the officer.  See McMeen, 49 F.3d 225; Navarro, 979 F.2d at 788.  Furthermore, Tabion did not testify to possessing or utilizing

any of the items mentioned here – let alone to "facilitate" anything.  In addition, if paragraph 46 of the presentence report specifically states that "there is insufficient evidence to establish that the 'ice' [Tabion distributed] was actually provided by [Schulze]", then there is definitely no evidence to establish that Schulze provided a single item which "Tabion voluntarily provided investigators", which, distinctly means that there is no connection between these items and Schulze.  Accordingly, paragraph 31 is irrelevant and must be struck from consideration and the presentence report.

¶32:  No evidence exists to support the statements contained in paragraph 32.  Furthermore, they are irrelevant to Schulze and the instant matter.  And moreover, Byrd swore at trial that he "stopped doing business with [Schulze]" "in '98, probably '99."  (RT:5-47).  And finally, paragraph 46 specifically expresses the finding that Schulze did not provide the "ice" that Byrd distributed to Olaes.  Therefore, the statement that Byrd "distributed methamphetamine on Schulze's behalf to [Olaes] on a regular basis between 11/1/2001 and late December 2001" is a contradictory and unsupported claim.  Accordingly, paragraph 32 must be struck from consideration and the presentence report.

¶33:  Schulze objects to the statement that "investigators **recovered** $23,000 in United States currency," (Emphasis added).  This amount was not "recovered", rather, it was taken by the FBI and later returned to Schulze pursuant to a court order because the cash was withdrawn from a legitimate construction loan, and it was in no way connected to any criminal activity.  Accordingly, the reference to "$23,000 in United States currency" must be struck from consideration and this report.

¶34:  No evidence exists to support the statements contained in paragraph 34.  In addition, statements allegedly made by Grimm are in stark contrast to statements made by Tabion, and they are unsupported by evidence.

For example, it is stated that "for over a year prior to [Grimm's] arrest", which occurred on 4/22/1999, he would send methamphetamine concealed in "paint cans" to "Tabion's Rod Shop." It is also stated that "Tabion was aware of the contents of the shipments because he would often remove the paint cans from inside the stool compartment and remove the paint labels from the can." However, Tabion testified that he first began to see paint cans "probably in mid - '99." (RT:5-117). Mid-1999 would follow Grimm's April 1999 arrest and therefore make his participation impossible. Another example is that Grimm "informed that Tabion received $5,000 per pound delivered to the Rod Shop." However, Tabion testified that he received "$2,000 a package, a box, per delivery." (RT:5-115). At trial, Grimm testified that he sent "as much as six pounds twice a week" (RT:2-45), yet Tabion made no mention of how often he would receive packages, but stated that he would be paid "just before Mike would go back home to Vegas", which was at "one point [] probably like once a month." (RT:5-118). Without some indicia of reliability, as requited in <u>Lee v. Illinois</u>, supra, Grimm's post arrest statements contained in paragraph 34 are unreliable and must be struck from consideration and the presentence report.

¶35: No evidence exists to support the statements contained in paragraph 35. Furthermore, these statements contradict Grimm's trial testimony. For example, here it states that Grimm "sold a pound of methamphetamine for between $15,000 and $35,000." At trial, Grimm swore that he sold a pound "from 30 to 50 -- $55,000 a pound." (RT:5-51). Here it states that Grimm would "return to Los Angeles with between $100,000 and $150,000 in drug proceeds." At trial, Grimm stated that the amount was "from 100 to 250,000 usually" (RT:2-50), then he stated that "it could be from -- from $40,000 to $350,000." (RT:2-38). Because the truth is the easiest thing to remember, the varying degree of Grimm's stories prove him unreliable. In

addition, Grimm was arrested three years before Schulze was ever indicted.

Not only does the temporal proximity make it impractical to establish a nexus

between Grimm's criminal conduct and Schulze, see U.S. v. Hill, 79 F.3d 1477,

1484 (6th Cir. 1996) (finding that "temporal proximity is extremely week in

that nineteen months is exceedingly long laps between offenses."), but there

is no proof whatsoever to support any statement made by Grimm, or establish a

connection to Schulze.  In fact, considering that Grimm's arrest was more than

three years old when Schulze was indicted, it is evident by the fact that

Grimm was never mentioned in either indictment – that there was nothing to

connect him to the instant case.  Moreover, no part of any statement contained

in paragraph 35 has any relevancy to Schulze.  What Grimm did and sold has

absolutely nothing to do with Schulze, a confession made even by an accomplice

is presumed unreliable unless accompanied by some indicia of reliability.

Accordingly, paragraph 35 must be struck from consideration and the

presentence report.

¶36:  The statements that Grimm, Yamada, Byrd, and Tabion "testified to

their roles a Schulze's drug associates from 1997 until 3/22/2002", and "each

corroborated the information outlined in the offense conduct regarding

Schulze's role as the operator of a large-scale and profitable

methamphetamine trafficking enterprise" are unsupported and speculative

claims, and no testimony or evidence exists to support these statements.  To

begin with, the claim that the period of the "enterprise" expanded from "1997

until 2/22/2002" is an overly exaggerated statement.

According to Tabion (who Grimm claimed he sent his packages to), he did

not begin to accept packages at his shop until "later on" (after) "late '98'.

-31-

(RT:5-113). Based on the Government's own witness, the alleged trafficking enterprise could not have begun until sometime after "late '98" - nearly two years later than claimed. This, then, eliminates Grimm's alleged "role" during the period where he claimed to be picking up the packages from Tabion and distributing the purported controlled substance to Byrd. And this also dispels Byrd's claim that he was supplied by Grimm and Yamada in 1996 and 1997 (RT:5-36), which would have been impossible if credence is given to Grimm's and Yamada's testimony - where Grimm claimed he delivered the substance to Byrd in 1998 until his arrest in April of 1999 (RT:2-44), and Yamada swore that he delivered the substance to Byrd (RT:2-105) after becoming involved "sometime around '99" (RT:2-95), until his arrest in July of 2000 (RT:2-91). However, Byrd swore that he "quite selling dope ... in '98, probably '99." (RT:5-47). If credence is given to Byrd, then Yamada's "role" is completely eliminated because Byrd quit before Yamada became involved. Further, if Byrd was telling the truth during trial, then Grimm testified falsely because Byrd quit selling dope during the same period when Tabion swore he first began to receive the packages that contained the substance Grimm swore he delivered to Byrd. One fact that supports Byrd's position here is that Grimm was arrested while selling drugs to Randal Wong (RT:2-30), a person assisting the DEA and who has no connection to the instant matter. The fact that Grimm was off and selling drugs to a person other than Byrd - the main individual he claimed he delivered the substance to - supports Byrd's position that he had quit selling dope, which explains why Grimm went elsewhere to distribute. And there is further support in the fact that Byrd was not charged for any criminal acts committed prior to distributing a controlled substance to Olaes between 11/1/2001 and late December 2001. (RT:5-31).

With Byrd's "role" ending sometime between 1998 and 1999, and Grimm's "role" ending with his arrest on April 22, 1999, and Tabion's "role" ending

upon Grimm's arrest (as Grimm ceased to send packages), the "large-scale ... trafficking enterprise", which had begun sometime after "late '98" and ended in "April 1999", lasted approximately 4 months - not 5 years as the Government claims. And even if it is determined that Yamada did deliver to Byrd, his arrest in July of 2000 would end the "enterprise" because there were no other acts committed following his arrest that involved Byrd or Grimm. And as for Tabion, he testified that he had no contact with Schulze in 2000. (RT:2-129). Consequently, at most, the duration of the alleged "enterprise" lasted from "late '98", presumably 1999 (according to Tabion), until July 2000 - not from "1997 until 2/22/2002" - because all activity ended upon Yamada's arrest.

There is not a single shred of evidence - tangible or corroborative - to support the suggestion that Tabion received any packages following the period of Yamada's July 2000 arrest. And no support can be found in Tabion's sworn testimony, in fact, his statements contradict this insinuation. For example, Tabion testified that he agreed to accept packages to "make a lot more money" (RT:5-114); that this occurred "later on" after "late '98". (RT:5-113). Yet when Tabion was asked whether he could recall loaning Schulze money in "2000 or 2001" (the period following Yamada's arrest), Tabion replied, "I can hardly remember because I was broke myself." The fact that Tabion was broke clearly indicates that he was not receiving packages in 2000 and 2001.

In addition, in May of 2001, Yamada informed investigators of the alleged activities involving Schulze (RT:3-16), and in August of 2001, Olaes informed the same investigators of the alleged activities involving Schulze (RT:3-16), and on September 20, 2001, recorded a meeting allegedly involving Tabion (RT:3-31 & 3-49), and on October 4, 2001, allegedly paid Tabion $2,000 at Tabion's shop (RT:3-36), and on October 13, 2001, allegedly obtained 26 grams from Tabion at Tabion's shop (RT:3-74), and on October 19, 2001, allegedly provided Tabion $2,000 at Tabion's shop for the 26 grams (RT:

3-74). When considering that Tabion was indicted on March 21, 2002, federal
investigators had spent nearly 10 months on the instant matter. And despite
all this information and concentrated efforts, including actual surveillance
on Tabion's shop (RT:3-70), not a single box or package was ever intercepted
or seized. In fact, there is no trace of evidence whatsoever in this case to
prove that Tabion ever received anything - especially following the period of
Yamada's July 2000 arrest. What is more, even the Government acknowledges
this fact by recognizing that there is insufficient evidence to support
Tabion's claims that Schulze provided the "ice" distributed to Olaes. (See
Presentence Report, ¶46). If there is insufficient evidence that Schulze
provided Tabion with a controlled substance, then there is also insufficient
evidence that Schulze sent Tabion a package containing a controlled substance.

In addressing the statement that the alleged enterprise was
"profitable", the Government fails to support this unfounded claim. At trial,
the Government relied on spreadsheets and summary charts produced by FBI
financial analyst, Conrad Ho, who admitted that his figures included bank
loans, account transfers, money market certificates and IRA accounts, and that
his calculations also include "double-counting" (RT:6-70), and were not really
accurate. (RT:6-67). Moreover, the only cash seized in this case was from a
documented construction loan, and no allegations of money laundering or income
tax evasion were ever mentioned. Furthermore, not a single item was seized
and forfeited from others alleged to have been members of the "enterprise".
All that had been taken from Schulze was forfeited by the jury based on the
Government's use of manufactured documents that exaggerated actual income and
banking activity. There is no proof to support any claim of profit in the
alleged "enterprise", especially in light of the fact that Tabion swore he was
"broke" in 2000 and 2001. For all the reasons explained above, paragraph 36
must be struck from consideration and the presentence report.

¶37:  No evidence exists to support the statements contained in paragraph 37.  First of all, there was no evidence or testimony that either company mentioned here was a "shell corporation".  In fact, during trial the Court sustained Schulze's motion to strike the Government's speculation that Innovative Investments was "apparently a shell corporation".  (RT:4-11). Second, there was no company known as "New Vision Equipment", and accordingly no "corporate account".  Third, there was never an account for Galaxie Records let alone a "corporate account".  Fourth, the statement that evidence was presented that "reflected over $1,000,000 in deposits to these three corporate accounts" is completely unfounded.  The $1,000,000 figure is based on manufactured documents that include income from Schulze's mother and financee, as well as several mortgage loans and retirement funds.  Of more import, these figures were double-counted to reflect a larger income than tax records showed (RT:6-70), and were not really accurate.  (RT:6-67).  Fifth, tax records did indeed reflect legitimate income for Schulze.  (RT:8-8).  For the reasons stated above, paragraph 37 must be struck from consideration and the presentence report because it is an entirely baseless claim.

¶38:  The statements contained in paragraph 38 are inaccurate.  For example, Dr. Brian Thompson did not testify that Schulze "had previously worked as a carpenter for [him]."  Dr. Brian Thompson testified that he witnessed Schulze's office in Atlanta where he managed his recording business, and went to his cabinet shop as well.  And that while in Las Vegas, he "saw several homes that [Schulze] had built" and witnessed Schulze "directing and instructing his building crew."  (RT:6-107, 108).

As for Carl Gaumont, he testified that Schulze was "a very good carpenter" (RT:6-99), that a "good carpenter" can make 40 to $50,000 a year (RT:6- 100), that Schulze worked for him from 1990 to 1994 (RT:6-98), 1996 to 1997 (RT:6-99), and in 1998 (RT:6-101), and that he paid Schulze in cash.

(RT:6-102).

The testimony of Schulze's witnesses is an important element that must be stated in the presentence report, because it demonstrates that Schulze was employed and received legitimate income in the form of cash, which explains the "miscellaneous income" he reported (RT:8-15), which, the Government referred to as a "red herring" (RT:8-14), and it proves that Schulze earned $50,000 per year, and it justifies the cash deposits that the Government claims was drug proceeds.

In regard to the "CI", no evidence exists to support the statement that Olaes "obtained [drugs] in controlled transactions with Schulze." Accordingly, paragraph 38 must be amended to accurately reflect the testimony of Schulze's witnesses and his employment and income, and strike the portion pertaining to Olaes because it is a baseless claim as Olaes has admitted to deceiving everyone in this case.

¶39:  No evidence exists to support the statement that "[B]ased on the evidence and testimony presented at trial, Schulze was adjudged guilty by jury verdict as to Counts 1, 2 and 3 of the Second Superceding indictment on 2/11/2003." The jury returned a general verdict finding that Schulze was guilty of committing the general offense of conspiring to possess with an intent to distribute, and distributing a **controlled substance.** There is not a single shred of evidence upon which to base what aspect of the trial the jury relied.  Nothing supports the statement that the jury relied on the testimony.  The jury may have relied solely on the recorded evidence and not the testimony.  Furthermore, Schulze was not permitted to submit a special verdict form which would have provided an indication of reliable testimony had it found him responsible for a quantity larger than alleged.  The Ninth Circuit has held that whether a witness lied or errored in their perceptions or recollections are proper questions for the jury "because the determination

of credibility is for the jury." U.S. v. Candoli, 870 F.2d 496, 506 (9th Cir. 1998). And here the jury was never asked and consequently did not indicate whether it found any testimony to be reliable. Accordingly, because this statement is pure speculation, it must be struck from the presentence report.

In regard to the statement that the "jury returned a Special Verdict finding that specific property identified in Count 4 constituted or was derived from proceeds..." - it is inaccurate because not all items identified in Count 4 were found to have been property subject to forfeiture. During the hearing, the Government moved to remove two vehicles from the jury's consideration following concerns expressed by the jury that the items were not derived from illegal activity. Accordingly, the appropriate corrections must be made.

¶43: Pursuant to U.S.S.G. § 1B1.11(b)(1), the guidelines in effect at the time the defendant committed the offense must be utilized for guideline computation purposes when those guidelines are more advantageous to the defendant. And accordingly, if the Government claims that the alleged conspiracy began in January of 1997, then the guideline in effect in 1997 must apply if they are advantageous to Schulze.

¶44: The statement in paragraph 44 is irrelevant to this matter as "ice" was not charged in either indictment, nor was the jury instructed that the alleged offense involved "ice", nor does the jury's verdict form indicate that the general offense involved "ice". Accordingly, paragraph 44 must be struck from the presentence report.

¶46: No evidence exists to support the statements contained in paragraph 46. To begin with, there is no evidence that Schulze "distributed a total of 101.971 grams net weight if 'ice' to [Olaes] on 8/30/2001 and 10/2/2001." The jury's verdict as to Counts 2 and 3 do not support this claim. The jury was instructed that in order to find Schulze guilty, it

must find that Schulze "knowingly delivered 5 grams" and "50 grams" of
"methamphetamine or some other prohibited drug." (Exhibits **"B"** and **"C"**,
respectively). The suggestion that the verdict reflects the offense involved
101 grams of "ice" is pure speculation. Especially in light of the fact that
Schulze specifically requested a jury's determination – which the Government
then objected to – and the Court denied. There is a significant difference
between "some other prohibited drug", "methamphetamine", and "ice". "Ice" is
a substance which is considered 10 times more severe than methamphetamine,
i.e., see U.S.S.G. § 2D1.1(c)(7) ("[a]t least 50 G but less than 200 G of
Methamphetamine, ... or at least 5 G but less than 20 G of 'Ice'"), and is a
factor that can increase a sentence beyond that of methamphetamine or some
other prohibited drug. See § 2D1.1(c)(7) (prescribing Base Offense Level 26
for 50 grams of Methamphetamine), compare with § 2D1.1(c)(4) (prescribing
Base Offense Level 32 for 50 grams of "Ice"). Pursuant to the Sentencing
Table provided by the Guidelines, in Criminal History Category I, Level 26
prescribes a term of 63 to 78 months imprisonment, whereas Level 32 prescribes
121 to 151 months. Clearly, an offense involving "ice" nearly doubles the
range of punishment compared to an offense involving methamphetamine. Under
Apprendi, any fact (other than a prior conviction) that increases the penalty
for a crime beyond the (facts reflected in the jury's verdict (Blakely, 124
S.Ct. at 2537)), must be submitted to a jury and proven beyond a reasonable
doubt. Apprendi, 530 U.S. at 490. The importance of instructing the jury on
the difference between methamphetamine and "ice" is a recognized fact in the
District Court for the District of Hawaii, where Chief Judge, the Honorable
Helen Gillmor, specifically expressed that drug type, purity, and quantity,
are significant factors that "affects the sentencing." (See Exhibit **"F"**). In
the instant matter, drug type, purity, and quantity were not submitted to the
jury and proven beyond a reasonable doubt and therefore cannot be applied.

Second, Olaes admitted to tampering with the evidence he provided the FBI on August 30th and October 2nd, 2001.  Because this evidence was altered and not in it original form as when the alleged crime was committed, it is not a reliable source upon which to base weight and purity.  See Gallego, 276 F.2d at 917.  Furthermore, Olaes admitted, and the FBI were aware, that Olaes purchased "ice" on a weekly basis from Emory (RT:4-105); that Olaes had received $18,000 in cash payments during the period where he provided his "services" to the FBI (RT:6-131); and that he was informed early on that he could file a claim to receive up to $250,000 if Schulze was convicted through his assistance.  (RT:4-78).  When considering that Olaes had the cash (FBI payments), source (Emory), and motive ($250,000 reward), and when considering the fact that Olaes admitted to deceiving the FBI and committing a number of other criminal acts without the knowledge or authority of the FBI (RT:4-87), it is very likely that Olaes purchased "ice" from Emory and claimed it from a different source, or he could have easily traded or manipulated the substance he eventually delivered to the FBI in return for a chance to receive $250,000.  In any event, the 101.871 grams that Olaes provided the FBI is not reliable.

Next, U.S.S.G. §§ 1B1.3(a)(1) and (2) is not applicable because there is no evidence that the "2,458.2 grams of 'ice' concealed in three paint cans sent via Federal Express to Susan Fukumoto on 7/21/2000" "was part of the same course of conduct or common scheme or plan of the offense of conviction."  At trial, the Government introduced a substance that Yamada testified "look[ed] like the same" "substance [he] packed up" and sent to "Susan's working place", which was "pretty close to four pounds."  (RT:2-120).  Yamada stated that he obtained the quantity seized from Fukumoto in Long Beach, California, after receiving a call from "Mike."  (RT:2-118).  No witnesses or evidence was introduced to support Yamada's claims and Fukumoto declined to testify.  Schulze's request for a special verdict form was premised solely on

the fact that Yamada's testimony would serve as the basis upon which the Government would later seek to enhance his sentence. And in accordance with this foreseeable act, Schulze moved the Court to allow the jury to make an individual finding with respect to the quantity of controlled substance it found attributable to him. In this effect, the jury would decide whether it found Yamada's testimony credible by finding that Schulze was responsible for the quantity seized in the Yamada/Fukumoto case, i.e., "[A]t least 1.5 kilos or more?" (Defendant's Proposed Special Verdict Form, Exhibit **"G"**). Had the Government been secure in Yamada's testimony, it would not have suggested a special verdict at the beginning of trial (RT:1-107), then vehemently object when Schulze moved to submit one. (RT:7-5). Because Schulze was not allowed to inquire, and the jury was not instructed, and the verdict form bears no indication of drug quantity or type, and because there is no proof to support Yamada's claims, §§ 1B1.3(a)(1) and (2) cannot apply to this case. Moreover, the findings contained in paragraph 45 prevents §§ 1B1.3(a)(1) and (2) from applying because "Counts 2 and 3 charge the substantive offenses that were the **sole object of the conspiracy charged in Count 1.**" (Emphasis added). Counts 2 and 3 have no relation to Yamada or Fukumoto, and accordingly have no relation to the "conspiracy charged in Count 1." Furthermore, the Government seeks an additional enhancement under U.S.S.G. § 3B1.1(a), suggesting that Schulze was the leader or organizer of the alleged conspiracy. The Government claims that Grimm, Yamada, Fukumoto, Tabion and Byrd make up the participants involved in the instant offense. (See paragraph 51). Under §§ 1B1.3(a)(1) and (2), a defendant is responsible for criminal acts jointly taken by others. In this respect, Fukumoto, Grimm, Tabion and Byrd must all be held accountable for the same 2,458 grams because each is an alleged participant in the same purported conspiracy. However, the fact that none of them were held accountable for Yamada's quantity despite their alleged involvement is proof

positive that there simply lacks any evidence to support the application of §§ 1B1.3(a)(1) and (2), and accordingly cannot be applied to the instant matter.  Under the Sentencing Guidelines, each conspirator is to be judged on the basis of the quantity of drugs he reasonably foresaw or which fell within "the scope" of his particular agreement with conspirators, rather than distribution made by entire conspiracy.  U.S. v. Gutierrez-Hernandez, 94 F.3d 582, 583 (9th Cir. 1996) (opinion authored by the Honorable David Alan Ezra). Here, there is no evidence that any agreement existed between Yamada and Schulze, or that Schulze could have "reasonably foresaw" the quantity that Yamada obtained.  In U.S. v. MacDonald, 992 F.2d 960 (9th Cir. 1993) (sentence remanded), the court held that the presentence report did not clearly detail the level of the defendant's involvement in a 25 Kilo sale. The report presented "no facts on which the court could have based a finding that [defendant] knew or could reasonably foresee the 25 Kilograms transaction." MacDonald, 992 F.2d at 967.  "Even if the district court relied on testimony received at [defendant's] trial, there were no additional facts presented to support this finding." Id.  In the instant case, there are no additional facts to support Yamada's say-so, and consequently no additional facts to support a finding that Schulze had any involvement in the shipping of the 2,458 grams.  "There must have been some evidence to show that the shipment was within the scope of the agreement." U.S. v. Pagan, 196 F.3d 884, 892 (7th Cir. 1999).  Here, there is no such evidence.  And finally, it is noteworthy to point out that the Government has determined there to be "insufficient evidence to establish that the 'ice' [Tabion and Byrd distributed to Olaes] was provided by the defendant [Schulze]" (Presentence Report, ¶46), yet it attempts to attribute a quantity seized nearly two years prior to his arrest and from two persons not even charged in the same case. If there is insufficient evidence to establish that Schulze provided Byrd and

Tabion - his only co-defendants - with the substance they claimed he provided, then there is insufficient evidence to establish that Schulze provided the 2,458 grams that Yamada claimed he provided. Especially in light of the fact that Tabion and Byrd were the only persons charged with Schulze, and "Yamada was not in this case". (RT:6-177, see Exhibit "H"). Moreover, considering the laps between the July 2000 seizure from Fukumoto and Schulze's April 2002 arrest, the temporal proximity is extremely week to support any connection from the Yamada/Fukumoto case to the instant matter. U.S. v. Hill, 79 F.3d 1477, 1484 (6th Cir. 1996). For all the reasons expressed and articulated above, U.S.S.G. §§ 1B1.3(a)(1) and (2) does not apply and must be struck from consideration. In addition, Schulze submits that § 1B1.3(a)(2) violates the constitution. See U.S. v. Galloway, 976 F.2d 414, 437 (8th Cir. 1992)(en banc) ("we conclude that section 1B1.3(a)(2) flagrantly violates the Constitution.")(Bright, Senior Circuit Judge, with whom Richard S. Arnold, Chief Judge, Lay, Senior Circuit Judge, and McMillian, Circuit Judge, join, dissenting).

Next, no evidence exists to support the statement that "Fukumoto [] informed investigators that ... Yamada sent her pound quantities of 'ice' on a monthly basis from Las Vegas, Nevada." Fukumoto did not testify and her statements were not subject to cross-examination. See Huckins, 53 F.3d at 279. Not a single shred of evidence has been provided to prove Fukumoto's statement reliable. See Lee, 476 U.S. at 2065.

In respect to Yamada, no evidence exists to support the statement that "Yamada noted that the defendant was the sole source of the 'ice' that he sent to Fukumoto." At trial, Yamada testified that he obtained the quantity seized from Fukumoto at "a Starbucks coffeehouse" from "Gus". (RT:2-118). Yamada did not state that Schulze was his source. In addition, Yamada only became aware that the substance he shipped was "ice" - rather than methamphetamine -

-42-

after he "went through the lab reports and all of that in [his] case." (RT: 2-141). As such, Yamada had no knowledge or control over the purity of the substance he obtained and shipped to Fukumoto, and he therefore could not have been sending Fukumoto "pound quantities of 'ice' on a monthly basis." A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Federal Rules of Evidence, Rule 602. Here, no evidence has been submitted to support statements or testimony made by Yamada that the substance he obtained and shipped was in fact "ice", i.e., methamphetamine of at least 80% purity. See U.S.S.G. § 2D1.1(c). And last, no evidence supports the statement that Yamada "advised that all the drugs were distributed in Hawaii by sub-distributors working for the defendant." To start with, Grimm had been arrested when Yamada took his place (RT:2-131), so Grimm is out. Second, Yamada testified that he delivered to "Candy Man and Blacky" (RT:2-112), however, these individuals have never been identified and there is no proof that Schulze knew a single one. Third, this very paragraph (¶46) states that there is insufficient evidence to establish that Schulze provided Byrd or Tabion with the "ice" they sold to Olaes. Without Grimm, Byrd, and Tabion, there is no other identified that could be a sub-distributor. And there has not been a statement from Fukumoto admitting she was a sub-distributor also.

No evidence exists to support the statement that "[A]ccording to investigators, Tabion and Grimm corroborated Yamada's statements that from approximately 1998 to 4/2/2002, the defendant shipped pound quantities of 'ice' to Hawaii in paint cans." First of all, Grimm could not have "corroborated Yamada's statement" because Yamada took his place. Grimm could not have known what Yamada was doing because Grimm had been arrested and was in prison. Second, Yamada made no mention of knowing Tabion and did not testify to sending his packages to Tabion. Third, Grimm's, Tabion's, and

Byrd's participation ended before Yamada's began - as was testified by them. It therefore cannot be possible that any statements made by Tabion, Grimm, or Byrd "corroborated Yamada's statements". Fourth, Grimm's and Tabion's period of participation began in 1999 and ended in April of 1999, and Yamada's period began in July of 1999 and ended in July of 2000. It is therefore impossible that anyone could "corroborate" anything occurring "to 4/2/2002", much less following Yamada's arrest. Fifth, no evidence exists to prove that Schulze "shipped pound quantities to Hawaii" - nothing was ever seized to support this baseless claim, nor does there exists a single shipping receipt as evidence, and no proof exists to support the claim that the substance Schulze supposedly shipped was "ice".

No evidence exists to support the statement that "Tabion confirmed that Yamada began sending pound quantities of 'ice' to Hawaii after Grimm was arrested in April 1999." To begin with, Tabion testified that he never opened the boxes (RT:5-116), and therefore he could not have known that they contained "pound quantities of 'ice'". Tabion's statement therefore constitutes hearsay, and while a court may consider hearsay statements, they must be accompanied by "some indicia of reliability." Petty, 982 F.2d at 1369. Here, not a single package or receipt has ever been produced to support Tabion's claims, and consequently, no evidence to prove that any packaged he claimed to have received contained anything, let alone "ice". Second, Yamada did not testify to knowing Tabion or to having sent his packages to him.

No evidence exists to support the statement that "the 2,458 grams net weight of 'ice' seized by investigators on 7/21/2000 was sent by the defendant as part of the same course of conduct or common scheme or plan as the offense of conviction." First of all, the quantity seized was not "2,458 grams" and the substance was not "ice". At Yamada's change of plea hearing of May 21, 2001, the Government clearly stated that "on or about July 20th of the year

-44-

2000 that the defendant [Yamada] shipped a package containing approximately **four pounds** of crystal methamphetamine via Federal Express from Las Vegas, Nevada, to Susan Fukumoto again in Honolulu, Hawai'i." (Emphasis added) (see Exhibit "I"). Furthermore, at trial, Yamada identified the substance as "pretty close to **four pounds**." (Emphasis added) (RT:2-210), and stated that the substance presented by the Government "look[ed] the same" (RT:2-120), but could have been brown sugar. (RT:2-142). The Government's statements at Yamada's change of plea hearing clearly indicate that the quantity seized was "approximately **four pounds**"; that the substance was "methamphetamine"; and that Yamada shipped the substance to Fukumoto. There was no allegation then that Schulze was ever involved. Second, despite the 29-month period between the claimed seizure of the 2,458 grams and Schulze's Second Superceding Indictment, the Government never alleged that Schulze may have been connected in any way to the substance seized. And despite its intent to enhance Schulze's sentence based upon the quantity seized in the Fukumoto/Yamada case, the Government never provided a single shred of evidence during the discovery phase or trial of this matter. Third, according to Apprendi and Buckland, drug quantity and type is a sentencing factor which must be proved to the jury beyond a reasonable doubt. By alleging that "50 grams or more" of methamphetamine was included in the conspiracy, the Government was seeking an enhanced penalty under 841(b)(1)(A). Under an enhanced penalty provision, a defendant is entitled to submit a form of special interrogatories to the jury requiring of the amount of methamphetamine involved. See U.S. v. Williams, 229 F.Supp.2d 624 (E.D. Texas 2002) ("A general verdict along with a special interrogatories should be submitted to the jury.") Accordingly, in light of Apprendi's and Buckland's holdings, Schulze should have been allowed to submit a special verdict form to the jury for a quantity determination. However, despite the fact that the Government was advised of the matter beforehand by

defense counsel (see Exhibit **"J"**), and where it even informed the jury it could give a special verdict form to determine a lesser quantity (RT:1-107), Schulze's special verdict form request was denied. Now the Government attempts to attribute a quantity of drug that Schulze was prevented from submitting to the jury for a finding. Under the circumstances, applying an enhancement based on quantity not found by the jury beyond a reasonable doubt would violate Apprendi, Blakely, Buckland, and the jury trial rights guaranteed by the Constitution. Fourth, the proper standard of proof when enhancing a sentence based on drug type and quantity is proof beyond a reasonable doubt, not be a preponderance of the evidence. See Buckland, 289 F.3d at 568 ("We honor the intent of Congress and the requirements of due process by treating drug quantity and type, which fix the maximum sentence for a conviction, as we would any other material fact in a prosecution; it must be charged in the indictment, submitted to a jury, subject to the rules of evidence, and proved beyond a reasonable doubt.") In Booker, Justice Thomas stated that "[T]he Fifth Amendment requires proof beyond a reasonable doubt, not by a preponderance of the evidence, of any fact that increases the sentence beyond what could have been lawfully imposed on the basis of facts found by the jury." Booker, 125 S.Ct. at 749, n.6 (Thomas, J., dissenting). Fifth, Fukumoto did not testify and her alleged statements are not sworn and were not subject to cross examination. Statements that are not made under oath or subject to cross-examination are presumed unreliable. Lee, 476 U.S. at 530. And even if the Court were to rely on statements made by Fukumoto, there must be some additional facts to support her claims. See MacDonald, 992 F.2d 960. Sixth, paragraph 46 specifically states that there is insufficient evidence that Schulze provided Tabion with "ice", yet the Government suggests in the same paragraph that "[B]ased on statements by ... Tabion, it can be established by a preponderance of the evidence that ..." If there is

insufficient evidence to establish that Schulze provided Tabion – the only
other person charged in this matter – with the controlled substance allegedly
sold during the course of the immediate case, then it is impossible to
establish by any evidence, let alone a preponderance, that Schulze provided
Yamada – whose offense of conviction pre-dates Tabion's and Schulze's arrest
by nearly two years – with the controlled substance seized from Fukumoto,
especially in light of the fact that Yamada testified that he obtained the
quantity himself in California (RT:2-118), and that Schulze was in Florida
during that time.  (RT:2-147).  Moreover, Tabion did not receive packages from
Yamada and therefore could not have known anything about the quantity seized
from Fukumoto, nor was Tabion involved in any criminal activity during 2000
(RT:2-129) – the year the quantity was seized.  Tabion could not have made a
statement concerning the quantity seized from Fukumoto because he had no
knowledge of it, and he did not testify during trial to any facts surrounding
the event.  Therefore, the reliance upon Tabion to support the suggestion that
his statement "established by a preponderance of the evidence that [the
quantity seized from Fukumoto] was sent by the defendant [Schulze]" is
misplaced.  If the Government discounts Tabion's claim that Schulze provided
the "ice" sold to Olaes (Presentence Report, ¶46), then it must also discount
other claims made by Tabion.  Seventh, there is no evidence to support the
suggestion that the quantity sent on 7/20/2000 was "part of the same course of
conduct or common scheme or plan as the offense of conviction."  No evidence
can prove that the conspiracy in which Yamada and Fukumoto plead guilty to,
continued beyond their arrest or was connected to the instant offense.  It is
beyond dispute that when Yamada and Fukumoto were arrested in July of 2000,
Grimm was in prison, Tabion ceased receiving packages due to Grimm's arrest
and had no contact with Schulze during 2000, and Byrd had already quit selling
dope.  (RT:5-47).  Any course or common scheme or plan which may have existed

among these individuals ended on July 22, 2000. Moreover, overt act No. 1 of

the Second Superceding Indictment alleges that Schulze distributed drugs to

Byrd between 1997 and **2000**; that overt act No. 2 alleges Schulze distributed

drugs to Yamada between 1999 and **2000**; that overt acts Nos. 3 through 6 all

allege acts that occurred between 1999 and **2000**. There are no acts alleged

that involve Yamada or Fukumoto after **2000**, and Tabion and Grimm are not even

mentioned at all. The indictment itself is proof that no acts in furtherance

occurred following Yamada's and Fukumoto's arrest in **2000**. Of more import,

Schulze was not charged, much less mentioned, in the Yamada/Fukumoto case, and

not a single shred of evidence exists to connect criminal matter No. 00-00320

SOM (Yamada/Fukumoto) to the instant offense of conviction. In the instant

case, Schulze was charged with distributing an alleged 5 or more grams and 50

or more grams of a controlled substance to Olaes on August 30, and October 2,

2001 (Counts 2 and 3 respectively); then directing that the proceeds be paid

to tabion (Count 1 - Conspiracy), see Second Superceding Indictment. These

events are also recognized by the Government at paragraph 45 of the

presentence report where it states that:

> "Count 1 is grouped together with Counts 2
> and 3 ... because Counts 2 and 3 charged the
> substantive offenses that were the **sole
> object of the conspiracy charged in Count 1**."

Presentence Report, ¶45 (emphasis added). In addition, paragraph 46 states:

> "During the course of the investigation, the
> CI [Olaes] purchased additional quantities of
> 'ice' from Tabion and Byrd that they
> allegedly obtained from the defendant
> [Schulze]. However, there is insufficient
> evidence to establish that the 'ice' was
> actually provided by the defendant,"

Presentence Report, ¶46. Following the issuance of the Presentence Report,

the Government filed its Non-Objection on August 7, 2003 (see Exhibit **"K"**),

and accordingly agreed to the statements made above. In this effect, the

-48-

Government concedes that the alleged distribution to Olaes on August 30th and October 2nd, 2001 (Counts 2 and 3) was the **"sole object of Count 1"**, and the only act that involved Tabion – which then formed the **"conspiracy"** that Tabion plead guilty to – was his acceptance of payment on September 11th and October 4th, 2001 (overt acts 9 & 12), from Olaes for the controlled substance Schulze allegedly distributed to Olaes in Counts 2 and 3.  The Government further concedes that the substance Tabion distributed to Olaes on October 13, 2001, was not provided by Schulze and therefore not relevant to the offense of conviction.  This fact establishes that Tabion did not receive any packages from Schulze, which means that Schulze did not obtain a controlled substance in the Mainland and ship it to Tabion.  And this fact is further supported by way of demonstration that despite a seven month investigation and surveillance conducted on Tabion's shop, not a single package was seized, much less ever proven to have been shipped.  Consequently, no evidence exists to prove that the instant offense was part of the same course of conduct or common scheme or plan as the Yamada/Fukumoto case.  Here, the acts alleged in Count 2 and 3 are not "connected together by common participants or by an overall scheme", nor were the acts "repeated over time".  See U.S. Silkowski, 32 F.3d 682, 687 (2nd Cir. 1994); U.S. v. Sanders, 982 F.2d 4, 9 (1st Cir. 1992), cert. denied, 508 U.S. 963, 113 S.Ct 2937, 124 L.Ed.2d 686 (1993).  In addition, to qualify under U.S.S.G. §§ 1B1.3(a)(1) and (2), there must be "distinctive similarities between the offense of conviction and the remote conduct", i.e., the Yamada/Fukumoto case, and cannot be used to sentence Schulze based on "isolated, unrelated events that happened only to be similar in kind." U.S. v. Sykes, 7 F.3d 1331, 1336 (7th Cir. 1993).  Two offenses do not "constitute a single course of conduct simply because they both involve drug distribution." U.S. v. Maxwell, 34 F.3d 1006, 1011 (11th Cir. 1994).  Distribution of even two ounces on two occasions to a paid informant (Counts 2

and 3) is an isolated incident and completely unrelated to the Yamada/Fukumoto case. The mere fact that both conspiracies involved drug distribution does not prove a same course or plan or scheme. Maxwell, 34 F.3d at 1011. Moreover, Counts 2 and 3 – which were "the **sole object of the conspiracy charged in Count 1**" – do not involve the same participants as in the Yamada/Fukumoto conspiracy. Silkowski, 32 F.3d at 687. Schulze, Tabion, or even Olaes were not mentioned in the Yamada/Fukumoto case, and no evidence exists to connect the two conspiracies. The Yamada/Fukumoto conspiracy ended on July 22, 2000, due to their arrest. See U.S. v. Cruz, 127 F.3d 791 (9th Cir. 1997)(a conspiracy is deemed to continue until there is affirmative evidence of abandonment or withdrawal). The Schulze/Tabion conspiracy began on August 30th and ended on October 4th, 2001, which specifically involved an alleged drug distribution to Olaes on two occasions – Counts 2 and 3 – with Tabion accepting the payment – Count 1. A conspiracy consists of an agreement to engage in criminal activity coupled with one or more overt acts in furtherance of that conspiracy. U.S. v. Buena-Lopez, 987 F.2d 657 (9th Cir. 1993). Here, no evidence exists to prove that Tabion or Schulze agreed with Yamada or Fukumoto to engage in criminal activity, or that either committed a single act in furtherance of the Yamada/Fukumoto conspiracy, and Tabion, being a Government witness, never claimed that he or Schulze had any knowledge that Yamada was shipping anything to Fukumoto, or who Yamada's customers were. In fact, Tabion stated that he quit receiving packages upon Grimm's April 1999 arrest, and had no contact with Schulze in 2000. For prior acts to be considered as relevant conduct, the Government must show, "in sufficient portions" the similarity, regularity, and temporal proximity of prior acts to the current charged conduct. U.S. Soyland, 3 F.3d 1312 (9th Cir. 1993). The 29-month period between Grimm's April 1999 arrest and Tabion's acceptance of payment from Olaes on September 11th, 2001, is too significant a gap and far

too isolated an incident to prove "same course of conduct" as the Yamada/Fukumoto conspiracy.  Moreover, the "temporal proximity is extremely weak in that [twenty-nine] months is an exceedingly long lapse between offenses." Hill, 79 F.3d at 1484.  To the extent that there may exist tape recordings made by Olaes of which the Government relies to support its claim that Schulze was a participant in the Yamada/Fukumoto case - tape recorded conversations between a defendant and informant in which defendant mentioned his involvement with another person does not support a conviction for engaging in conspiracy to distribute a controlled substance. See U.S. v. Gore, 154 F.3d 34 (2nd Cir. 1998)("although remark could have indicated that defendant had buyer-seller relationship with another who was source for his drugs, it was insufficient standing alone to establish requisite conspiratorial agreement to distribute drugs.")  And knowing Yamada or Fukumoto does not prove involvement in a conspiracy to distribute. See U.S. v. Durrive, 902 F.2d 1221 (7th Cir. 1990)("A defendant's knowledge of, approval of, association with, or presence at a conspiracy is insufficient to establish the participation element.") See also U.S. v. Hernandez, 141 F.3d 1042 (11th Cir. 1998)("Knowledge of conspiracy alone is an insufficient basis for a conspiracy conviction."); U.S. v. Garcia, 151 F.3d 1243 (9th Cir. 1998)("There can be no conviction for guilt by association."); U.S. v. Salameh, 152 F.3d 88 (2nd Cir. 1998)("Proof of mere ... association with other defendants is insufficient to support criminal conviction.")(ellipsis added); U.S. v. Wilson, 160 F.3d 732 (D.C. Cir. 1998)("Person's general knowledge of planned crime is insufficient to prove conspiracy.")  The Relevant Conduct provision under U.S.S.G. §§ 1B1.3(a)(1) and (2) cannot be applied here because the offense of conviction is an isolated incident and completely unrelated to the Yamada/Fukumoto conspiracy, and therefore the quantity seized from Fukumoto ("2,458 grams") is not "part of the same course of conduct or common scheme or plan as the

offense of conviction."   Eighth, the application of the preponderance of the evidence standard to enhance Schulze's sentence beyond that justified by the jury's factual finding violates the Ex Post Facto Clause of Article I, § 10, cl 1 of the Federal Constitution because Booker caused an amendment to the Sentencing Reform Act by severing 18 U.S.C. § 3553(b), which, many sentencing courts now perceive as a way to avoid the stringent requirement of proof beyond a reasonable doubt, as established in Apprendi, which was firmly in place and the law of the land during the period when the offense of conviction occurred (2001), during the trial (2003), and subsequent sentence (2003), and where Booker's amendment now exposes Schulze to a longer period of imprisonment than he should have received under Apprendi because the jury did not find all the facts that the law made essential to the punishment.  In Apprendi, the Supreme Court held that "[O]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt."  Apprendi, 530 U.S. at 490.  The Ninth Circuit in Buckland (2002) applied Apprendi's rule to cases involving a controlled substance violation under 21 U.S.C. § 841(a)(1).  The court held that in order to "ramp up the punishment for controlled substance offenders based on the type and amount of illegal substance involved in the crime... drug quantity and type ... must be charged in the indictment, ... and proved beyond a reasonable doubt."  Buckland, 289 F.3d at 568.  Apprendi and Buckland were clearly established by 2003 when Schulze moved the court to allow a special verdict form that would require the jury to determine beyond a reasonable doubt, whether additional quantities existed to allow the Government to "ramp up" his punishment.  However, Schulze was denied and the jury made no such finding. At sentencing, the court found by a preponderance of the evidence that the offense of conviction involved an additional quantity and increased Schulze's

penalty beyond the ten-year statutory maximum authorized by the jury's verdict (based on the ten-year mandatory minimum under the aggravated penalty provision of § 841(b)(1)(A) for the 105 grams of methamphetamine alleged in the Indictment under the mandatory application of U.S.S.G. § 2D1.1(7)), which violated Schulze's Sixth Amendment right under Apprendi. Due to the court's error, Schulze was forced to appeal his sentence, and because of the continuance the Government filed in light of the pending Booker case, Schulze was remanded for resentencing more than two years after his original sentence was imposed, and, under a new "advisory" guidelines that Booker caused to be amended. Had Schulze been sentenced appropriately in 2003, he would have received a term under the mandatory application of the Guidelines that prescribed a term of imprisonment under the statutory maximum of ten years. However, because of the amendment to the statute (18 U.S.C. § 3553(b)), Schulze is now exposed to an increased range of punishment under a non-binding scheme where courts are now relying on a preponderance of the evidence standard to enhance sentences that under Apprendi they could not. See e,g, U.S. v. Ameline, 409 F.3d 1073, 1078 (9th Cir. 2005)(en banc) ("A constitutional infirmity arises only when extra-verdict findings are made in a mandatory guidelines system.") In Garner v. Jones, 529 U.S. 244, 146 L.Ed.2d 236, 120 S.Ct. 1392 (2000), the Court determined that the retroactive application of an amendment violated the ex post facto laws if the amendment "crates a significant risk of increasing the measure of punishment attached to the covered crimes." The standard established in California Dept. of Corrections v. Morales, 514 U.S. 499, 131 L.Ed.2d 588, 115 S.Ct. 1597 (1995), requires a defendant to demonstrate, by evidence drawn from the [statute's] practical implementation by the [court] charged with exercising discretion, that it's retroactive application will result in a longer period of incarceration than under the earlier [statute]." In the case at bar, under a

mandatory Guideline application, the Sixth Amendment would preclude a judge from enhancing a sentence based on extra-verdict findings such as drug type and quantity. Under the rule of Apprendi, the Sixth Amendment required that facts relied on to enhance a defendant's sentence beyond that justified by a jury's verdict must be proven beyond a reasonable doubt. Under Apprendi, the District Court could not have lawfully imposed any enhancements that would increase Schulze's sentence beyond the ten-year statutory maximum authorized by the jury's verdict because the jury did not find the Government proved any additional facts to support an enhancement. By excising (amending) 18 U.S.C. § 3553(b), Booker rendered the Guidelines advisory thereby circumventing Apprendi's Sixth Amendment requirements. In this effect, Schulze is now exposed to a longer period of incarceration than the ten-year period he would have faced under the mandatory Guidelines because he is no longer protected by Apprendi's Sixth Amendment rule that required proof beyond a reasonable doubt. A criminal defendant is not barred from challenging a change in the [United States] code on ex post facto grounds simply because the sentence he receives under the new law is not more onerous than that which he might have received under the old. Miller v. Florida, 482 U.S. 423, 96 L.Ed.2d 351, 107 S.Ct. 2446 (1987). For a statute to fall within the constitutional prohibition against ex post facto laws, two critical elements must be present: (1) the law must be retroactive, that is, it must apply to events occurring before its enactment, and (2) it must disadvantage the offender affected by it; a law is retrospective if it changes the legal consequences of acts complete before its effective date. Id. Here, the amendment to 18 U.S.C. § 3553(b) falls within the heartland of the ex post facto laws because the Court held that Booker's new law "applies to all cases pending on direct appeal." Booker, 125 S.Ct. at 769. Schulze was on his direct appeal when Booker's retroactive holding was issued and therefore satisfies Miller's first prong.

In addressing Miller's second prong, the disadvantage Schulze suffered by Booker's retroactive application is made obvious through the Government's written concession that the District Court erred when it originally sentenced Schulze beyond the ten-year statutory maximum authorized by the jury's verdict, by stating:

> "the District Court erred in making factual findings which increased Schulze's maximum sentence beyond that justified by the jury's verdict. At the sentencing hearing, the court made factual findings related to drug weight that went beyond the jury's findings of 50 grams or more of methamphetamine as charged in Counts 1 and 3. The Court also found that Schulze was an organizer or leader of criminal activity involving 5 or more persons. Based on this finding, Schulze's offense level increased by four levels."

(Brief of Appellee at 9 and 10). The legal consequences in existence at the time Schulze was sentenced was at most, a term of imprisonment of no more than ten years because the jury had not found the extra-verdict facts used to enhance his sentence beyond a reasonable doubt. In this effect, the District Court could not enhance Schulze's sentence beyond the ten-year maximum without violating his Sixth Amendment rights under the existing law of 18 U.S.C. § 3553(b). In contrast, under the amended law of Booker, a court is no longer bound by the mandatory provision of 18 U.S.C. § 3553(b), and may now rely on facts to enhance a sentence regardless of the maximum term authorized by the jury's verdict. Simply put, under Apprendi and § 3553(b)(1), the maximum term the court could impose without extra jury-found facts, was ten years. Whereas under Booker and the excise (amendment) of § 3553(b)(1), the maximum term the Court can now impose is life imprisonment. The difference between a maximum of ten years and a maximum of life is significant, and retroactively applying Booker's amendment to the case at bar will cause a disadvantage to Schulze by allowing the District Court to enhance his sentence using a standard of proof

(preponderance of the evidence) that was inapplicable at the time he was originally sentenced. Here, Schulze satisfies Miller's second prong because the legal consequences he is now exposed to under Booker's new law is greater than that which was applicable prior to Booker, and accordingly, the ex post facto clause must apply and prohibit the attribution of the "2,458 grams net weight of 'ice'" found "by a preponderance of the evidence".

For all the reasons established and argued above, paragraph 46 of the presentence report must be corrected.

¶48: The correct Base Offense Level in the instant matter is 6 (see U.S.S.G. § 2D1.1(c)(17)(for an unspecified amount of a controlled substance)). In the event drug type had been proven, the correct Base Offense Level would be 12 (see § 2D1.1(c)(14)(for an undetermined amount of methamphetamine or "ice")). And under the alleged 105 grams of methamphetamine charged in the Second Superceding Indictment (Counts 1, 2 and 3 combined), or the "101.871 grams" of methamphetamine recovered from Olaes, the correct Base Offense Level would be 26 (see § 2D1.1(7)(for 50 grams but less than 200 grams of methamphetamine)). Furthermore, this case does not involve "ice". All three Indictments in this matter specifically charged methamphetamine; the jury was instructed that the alleged offense involved "methamphetamine or some other prohibited drug"; and the jury's verdict does not indicate whether it found the offense involved methamphetamine or some other prohibited drug. The disjunctive "or" indicates a term must have different meanings. See U.S. v. Hill, 79 F.3d 1477, 1483 (6th Cir. 1996)("It is a basic principle of statutory construction that terms joined by the disjunctive 'or' must have different meanings"). "Cannons of construction indicate that terms connected in the disjunctive in this manner be given separate meanings." Garcia v. U.S., 469 U.S. 70, 73, 105 S.Ct. 479, 481, 83 L.Ed.2d 472 (1984). In the instant matter, the jury was given a choice between methamphetamine and "some

other prohibited drug", yet the jury was never asked of which controlled substance it believed the offense involved. The jury's instructions were ambiguous and it cannot be assumed by anyone that the instant offense involved "ice" when the jury was never asked. "To hypothesize a verdict that was never in fact rendered – no matter how inescapable the findings to support the verdict might be – would violate the jury trial guarantee." Sullivan v. Louisiana, 508 U.S. 275, 280 (1993). "It is fundamental that an appellate court (and for that matter, a trial court) is not free to decide in a criminal case that if asked, a jury would have found something it did not find." Pope v. Illinois, 481 U.S. 497, 501-11 (1987)(citing Jackson v. Virginia, 443 U.S. 307, 320, n.14 (1979). See also U.S. v. Quicksey, 525 F.2d 337, 341 (4th Cir. 1975), cert. denied, 423 U.S. 1087, 47 L.Ed.2d 97, 96 S.Ct. 878 (1976) ("in the absence of a special verdict, it is not possible to ascertain whether the jury intended to find the defendants guilty of conspiracy to violate the Travel Act or the Drug Act, or both."); U.S. v. Orozco-Prada, 732 F.2d 1076, 1083 (2nd Cir. 1984)("in the absence of a special verdict, there was no way for Judge Goettel to know whether the jury intended to convict [the defendant] for a cocaine-related conspiracy, for a marijuana-related conspiracy, or for a conspiracy involving both drugs.") The same applies here – there is no way to determine whether the jury intended to convict Schulze for a methamphetamine conspiracy, or a conspiracy to distribute "some other prohibited drug." To speculate would violate the standard Sullivan protects, especially in light of the fact that Schulze's request for a special verdict form was denied. In addition, the controlled substance "ice" prescribes a range of punishment that is ten (10) times more severe than methamphetamine (see, e.g., U.S.S.G. § 2D1.1(7) (prescribing a Base Offense Level 26 for 5 to 20 grams of "ice", or 50 to 200 grams of methamphetamine). Under the law of Apprendi (which was controlling during Schulze's trial), "any fact that increases the penalty for

for a crime beyond the prescribed statutory maximum must be submitted to the jury, and proven beyond a reasonable doubt." Apprendi, 530 U.S. at 490. Approximately one year prior to Schulze's trial the Ninth Circuit held in banc that Apprendi required that drug type (i.e., methamphetamine or "ice") must be charged in the indictment, submitted to a jury, and proved beyond a reasonable doubt. Buckland, 289 F.3d at 568. The Government was therefore required to charged that Schulze conspired to distribute and did distribute "ice"; it was also required to instruct the jury that Counts 1, 2 and 3 specifically alleged "ice"; and it was required to submit a special verdict form to the jury for a specific drug type and quantity finding, or at least provide specifics in the general verdict form that each count involved "ice". The Government did neither and subsequently "lost its opportunity to prove beyond a reasonable doubt that [Schulze] was responsible for more than [50 grams of methamphetamine]." (per Counts 1 and 3)(quoting U.S. v. Velasco-Heredia, 319 F.3d 1080, 1086 (9th Cir. 2003).

Moreover, relying on a preponderance of the evidence to determine that the offense of conviction involved "ice" following Booker's retroactive application of the amendment to 18 U.S.C. § 3553(b)(1) would violate the ex post facto clause because the standard at the time of trial was proof beyond a reasonable doubt, and "[A] fundamental principle of our jurisprudence is that a court will apply the law as it exists when rendering its decision ... [T]his principle applies even when a change to existing law occurs during the pendency of an appeal." DeGurules v. INS, 833 F.2d 861, 863 (9th Cir. 1987) (ellipsis in original). Accordingly, the controlled substance "ice" cannot be applied to the instant matter, and based on the ambiguous jury instructions and the general verdict form returned by the jury, the correct Base Offense Level is 6.

¶51:  U.S.S.G. § 3B1.1(a) is not applicable to this case because the

-58-

offense of conviction does not involve "five or more participants", nor was it "otherwise extensive". To begin with, the Government concedes that "Counts 2 and 3 charged the substantive offense that were the sole object of the conspiracy charged in Count 1." (Presentence Report, ¶45). In other words, the alleged distribution by Schulze to Olaes on August 30th (Count 2) and October 2nd (Count 3) in which Tabion received payment for on September 11th and October 4th (per Second Superceding Indictment, Overt Acts 9 and 10) constitute the conspiracy alleged in Count 1. And while Tabion did admit to accepting money from Olaes in "September and October, 2001" (RT:5-126), his testimony supports the contention that the offense of conviction was an isolated incident and that Tabion was an unwitting participant. At trial, when asked to describe his "first encounter with [informant] Olaes", Tabion stated:

> "I needed to borrow some money, so I called Mike up and asked if he could loan me like $2,000. He said: Yeah, I'll send somebody over there, and when he shows up, can you give him one of the envelopes that I left there for him? Steve [Olaes] later shows up at my shop, he asked if I had something for him. I gave him the envelope and he gave me the $2,000."

(RT:5-125). No part of Tabion's testimony offers a link between the instant offense and his brief participation with Grimm and Yamada, which began "later on" after "late '98" (RT:5-113) and ended upon Grimm's April 1999 arrest (see Presentence Report, ¶28). The temporal proximity of 2 years (July of 1999 to July or August of 2001 - see Presentence Report, ¶30) is an exceedingly long laps between offenses and does not constitute "relevant conduct" to connect Tabion's prior bad acts and the offense of conviction. See Hill, 97 F.3d at 1484. Furthermore, if there was more to Tabion's unwitting encounter with Olaes in September 2001, it is certainly hidden by the fact that Tabion "needed to borrow some money". Had Tabion been involved with a continuing

"distribution network" that was "substantial and profitable", he would not have the need to borrow $2,000.

In addition, Grimm, Yamada, Fukumoto, and Byrd are not participants and are therefore precluded from consideration under § 3B1.1. A "participant", for the purpose of applying a leadership role enhancement, is defined as a "person who is criminally responsible for the commission of the offense." U.S.S.G. § 3B1.1. Grimm, Yamada, and Fukumoto were long in prison when the offense of conviction occurred, and Byrd was not charged therein. The Government would be hard pressed to convince any court that these four are "criminally responsible" for the instant offense because the alleged acts committed by Schulze and Tabion were unforeseeable and therefore not relevant conduct. See U.S.S.G. § 1B1.3(a)(1)(B). It would fly in the face of logic to consider Grimm, Yamada, and Fukumoto "criminally responsible" for illegal acts committed by others while they are incarcerated, just as it would be for Byrd, who, had no involvement or knowledge of the alleged criminal activity of Tabion and Schulze. Accordingly, because Grimm, Yamada, Fukumoto, and Byrd were not "criminally responsible for the commission of the offense", they cannot be considered "participants". And consequently, section 3B1.1(a) does not apply because the offense of conviction only involves one "participant". And considering that Tabion's participation was unwitting, section 3B1.1 does not apply either. See U.S. v. McCoy, 242 F.3d 399, 410 (D.C. Cir. 2001) (Supervision of an unwitting participant cannot justify an enhancement under § 3B1.1). And even if Tabion was not unwitting, it is alleged that Schulze distributed 101 grams to Olaes who then paid Tabion, the "roles" are thus equal and do not qualify under § 3B1.1.

"For an increase under section 3B1.1 to be appropriate, there must be **evidence** to support a finding that the defendant occupied one of the four specific roles, not merely that the defendant was more culpable than others

who participated in the crime." U.S. v. Hoac, 990 F.2d 1099, 1111 (9th Cir. 1993), cert. denied, – U.S. – , 114 S.Ct. 1075, 127 L.Ed.2d 392 (1994) (emphasis added). Here, there is "insufficient evidence to establish that the "ice" [Tabion distributed] was actually provided by the defendant [Schulze]", and accordingly no evidence exists to prove that Schulze was more culpable than Tabion in the instant offense.

In order for section 3B1.1(a) to apply, the court must make a two-part finding that: (1) Schulze was an "organizer or leader of a criminal activity"; and (2) that the activity "involved five or more participants or was otherwise extensive." Jordan, 291 F.3d at 1097. The factors to be considered when determining whether a Schulze was an organizer or leader include: the exercise or decision-making authority, the nature of the participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, and the degree of control and authority exercised over others. See U.S.S.G. § 3B1.1 cmt. n. 4 (2000). And the Government bears the burden of proving these factors. Howard, 894 F.2d at 1089-90. Here, paragraph 51 of the presentence report claims that Grimm, Yamada, Fukumoto, Byrd, and Tabion are "participants", thereby bringing the head-count to five in an attempt to justify a leadership role enhancement. In this effect the Government must fail. As previously demonstrated, Grimm, Yamada, Fukumoto, and Byrd were not "participants in the commission of the offense" – Grimm was convicted in 1999 of aiding and abetting and possession with an intent to distribute – Yamada and Fukumoto were arrested in 2000 for conspiring with each other to possess with an intent to distribute – and Byrd was convicted in 2002 for distributing a controlled substance to an informant – neither of which have any connection to the instant offense allegedly committed by Tabion and Schulze in 2001. And while Grimm and Yamada testified that at some point in time Schulze had "shown" them how to obtain, ship, and

distribute a controlled substance, Grimm and Yamada admitted that each did in fact perform all aspects of their own crimes, where each would: (1) obtain the drug in Los Angeles, California; (2) package and ship it to Honolulu, Hawaii; (3) retrieve it and distribute it; (4) collect the proceeds; then (5) return to Los Angeles and pay their suppliers. See RT:2-37 through 2-47 (Grimm), and RT:2-98 through 2-107 (Yamada). Grimm and Yamada also made their own travel arrangements and purchased their own tickets. See RT:2-45 (Grimm), 2-121 (Yamada). In other words, Grimm and Yamada acted independently in the commission of their own crimes and were not "participants" of the offense of conviction. As for Fukumoto, there is no evidence that her "statements" were made under oath, nor did she testify where she would be cross-examined. It would be a violation of Schulze's due process of law by premising a sentencing enhancement upon a hearsay statement. See Huckins, 53 F.3d at 276. Without evidence that Fukumoto was "criminally responsible" for the instant offense, she cannot be considered a "participant". And as for Byrd, he testified that he "pled guilty to ... dealing hand-to-hand", and was "not [] in a conspiracy because I quit that". (RT:5-31). Byrd stated that he "stopped doing business with [Schulze] ... [I]n '98, somewhere probably '99." (RT:5-47). Moreover, Byrd was not charged with Schulze or Tabion in the instant offense, and Byrd nor Tabion testified to having knowledge of the other's existence. Because Byrd "quit selling dope ... [I]n '98, somewhere probably '99" (RT:5-47), it would be impossible for him to be "criminally responsible" for the alleged criminal acts committed in the instant offense by Schulze and Tabion in 2001. And accordingly, it is impossible to consider Byrd a "participant".

In addressing the "otherwise extensive" aspect, paragraph 51 claims that "between 1997 and 3/21/2002, the defendant was the organizer of a major methamphetamine distribution network". This statement is baseless. According to Grimm, the only way he brought the drug to Hawaii was by shipping it to "a

Custom Rod Shop. And the guy who owned that accepted the drugs for him." (RT:2-42). Grimm confirmed that all the drugs were sent to this shop. <u>Id.</u> According to Tabion, he was "approached once, like, late '98, if I could help Mike out by receiving packages at my business, and I told him no. And then later on ... I asked to borrow some money and he loaned me some money. And he said I could easily make money ... [by] accepting these boxes at my shop." (RT:5-114). Although Tabion does not specifically state at what point he did eventually accept a package, his sworn testimony indicates that it was after 1998, probably early 1999. Based on Tabion's sworn testimony (and because no other evidence is presented), the "distribution network" did not begin until early 1999 - not "1997". In April of 1999, Grimm was arrested (RT:2-44) and Tabion ceased receiving packages (see Presentence Report, ¶28). According to Yamada, he began sending packages "from Las Vegas to Honolulu on a monthly basis since July 1999." (Presentence Report, ¶12). Yamada was arrested in "July of 2000." (RT:2-91). Tabion testified that he had no contact with Schulze in 2000 (RT:5-129), and was "broke" in 2000 and 2001 (RT:5-130), which is when he called Schulze in September 2001 "to borrow some money". (RT:2-125). As for Byrd, based on his testimony, he simply purchased drugs from whomever brought them to him, and he never established an agreement with anyone. Moreover, he swore that he quit selling drugs in 1998 or 1999. The Chart below illustrates the overall period of Byrd's, Grimm's, Tabion's, and Yamada's commission of criminal activity.

| Byrd | ▓▓▓▓▓▓▓▓▓▓▓▓ | | ─ARREST |
| Grimm | ▓▓▓▓▓▓ ─ARREST | | |
| Tabion | ▓ | | ─ARREST |
| Yamada | ▓▓▓ ─ARREST | | |
| | 1996   1997   1998   1999   2000   2001   2002   2003 | | |

As described above, the period where Tabion accepted packages that Grimm shipped to supply Byrd was only four (4) months long. And even assuming Yamada did take Grimm's place and continued to supply Byrd, that activity did not involve Grimm nor Tabion, and it could not have endured too long because Byrd swore at trial that he quit in 1999. And even if Byrd lied, Yamada was arrested in July of 2000 and that ended all activity that might have involved Byrd. Accordingly, the "Major methamphetamine distribution network" that began in 1999 and ended on July 22, 2000 - existed for a year and a half. And this fact is echoed by Magistrate Judge Leslie E. Kobayashi findings that despite the "five-year period of time [alleged] ... The overt acts portion [] narrow[s] the time period of the alleged conspiracy to a year and a half to two-year period of time." (Order Denying Byrd's Motion for Bill of Particulars, see Exhibit **"L"**). And because the Government has failed to establish a connection between the one year and a half period and the offense of conviction, it cannot support the claim that the instant offense was "otherwise extensive". A conspiracy conviction under 21 U.S.C. § 846 (Count 1) "does not establish beyond a reasonable doubt that [Schulze] conspired with every other person [mentioned] in the indictment (or with any of them for that matter). It simply means that [Schulze] agreed with at least one other person [Tabion] to violate the drug laws." Petty, 982 F.2d at 1377 (quoting U.S. v. Thompson, 944 F.2d 1331, 1343-44 (7th Cir. 1991), cert. denied, - U.S. - , 112 S.Ct. 1177, 177 L.Ed.2d 422 (1992). Here, the Government cannot prove that "the scope" of the alleged agreement between Tabion and Schulze involved Grimm, Yamada, or Byrd. And where relevant conduct cannot be established under § 1B1.3, neither can a leadership role under § 3B1.1.

The statement that the offense of conviction was "profitable" is another baseless claim. Counts 2 and 3 ("that were the sole object of the conspiracy" charged in Count 1) charge the distribution of 2 ounces on August 30th (Count

2) with the expectation of receiving $4,800 (Overt Acts, ¶7), and 2 ounces on October 2nd (Count 3) with the expectation of receiving $2,000 (Overt Acts, ¶10). Here, $6,800 does not constitute "profitable".

As for the statement that Schulze "used shell corporations to launder over $1,000,000 in drug proceeds", this is another false claim. As explained in paragraph 37 of this Sentencing Statement, at page 35, the FBI fabricated documents in this case to falsely reflect deposits and account activity that was non-existent – there was no such amount. Ever. Furthermore, not a single witness said anything about shell corporations or laundering money. And here is another baseless claim: paragraph 51 of the presentence report states that "[T]he IRS concluded that the assets identified in the audit represented drug proceeds because he had no legitimate source of income." At trial, IRS Agent John Madinger (testimony at 2:7 through 2:26) testified as a Government witness. At no time did Agent Madinger utter Schulze's name or mention an "audit", or assets, or drug proceeds allegedly from Schulze, or even Schulze's income. In fact, when asked whether he had: "done any financial analysis; talked with any witnesses; drafted any reports; or drafted any financial accounting type records or anything like that in any kind of analysis of what happened in the Schulze case here", Agent Madinger answered "No". (RT:2-21).

As to the reliance on the preponderance standard to justify the application of § 3B1.1(a) to enhance Schulze's sentence, "the Fifth Amendment requires proof beyond a reasonable doubt, not by a preponderance of the evidence, of any fact that increases the sentence beyond what could have been lawfully imposed on the basis of the facts found by the jury." Booker, 125 S.Ct. at 749. Furthermore, the Sixth Amendment provides the right to a criminal defendant to be informed of each and every element of the crime charged, as well as the right to confront his accuser. Here, enhancing Schulze's sentence beyond the range authorized by the jury's verdict would

violate his constitutional rights, because the allegation that Schulze "operated a substantial and profitable methamphetamine distribution network"; a "criminal activity that involved five or more participants or was otherwise extensive", was never charged, submitted to the jury, or proven beyond a reasonable doubt. And while the Fifth Amendment requires these factors be proven to a jury before they can be applied to enhance a sentence, the Sixth Amendment requires that the Government inform Schulze of each and every element of the crime charged. And the elements cited here are found in a criminal statute enacted by Congress that specifically applies to a person who leads an activity of five or more persons to violate federal drug laws under 21 U.S.C. §§ 841(a)(1) and 846, and obtains a substantial income (as alleged in paragraph 51). See 21 U.S.C. § 848. Here, the Government seeks to increase Schulze's sentencing exposure by claiming Schulze (1) lead or organized a criminal activity that (2) was extensive, (3) involved five or more persons, and (4) was profitable – elements that Congress recognized as elements of an offense, which, the Sixth Amendment requires that notice be given so that Schulze can properly prepare a defense. Had Schulze been formally charged under the leadership statute of § 848, he would have sought to extract testimony directed to minimize participation and dispel the notion that the alleged offense involved five participants, that it was extensive, that it involved "profit", or that he controlled anything or anyone. "What evidence might have been proffered by [Schulze], in a defensive effort to minimize [the leadership role], if the indictment had properly charged the [elements] in the offense, is entirely speculative." C.f., Jordan, 291 F.3d at 1096-97. Moreover, had Schulze been given proper notice, he would have moved the trial court for a special jury finding. See U.S. v. Souffront, 338 F.3d 809, 833 (7th Cir. 2003)(special verdict finding under § 3B1.1(a)).

Far all the reasons established and argued above, paragraph 51 of the

Presentence Investigation Report must be struck because U.S.S.G. § 3B1.1(a) is inapplicable and therefore a 4-level increase unjustified.

¶53:  There are no adjustments applicable to the Base Offense Level of 6.

¶¶55 and 57:  The correct Total Offense Level is 6.

¶60:  Schulze challenges the validity of the information provided in paragraph 60 of the presentence report.  Since first receiving his presentence report, Schulze has made 14 attempts to verify the information provided in paragraph 60.  The last of which was made to the very Officer who drafted the report (see Exhibit "M").  To date, neither the State of Utah, the Cedar City Hall of Justice, the Iron County Justice Court, Cedar Precinct, nor the U.S. Probation Department has been able to confirm the information contained in paragraph 60.  Furthermore, paragraph 60 fails to state whether Schulze was represented by counsel in the matter stated.  Uncounseled convictions may not be used to enhance a sentence.  U.S. v. Kaneakua, 105 F.3d 463 (9th Cir. 1997).  And while in the instant case such a conviction, at this point, does not appear to cause an enhancement, Schulze has a right to collaterally attack an alleged prior conviction on the ground of a "complete denial of counsel."  Custis v. U.S., 511 U.S. 458, 496-97, 114 S.Ct. 1732, 128 L.Ed.2d 517 (1994).  Moreover, Schulze does not want the Court, the Bureau of Prisons, or the Canadian Government, to consider a DUI conviction that has not been proven or confirmed.  For these reasons, the information contained in paragraph 60 must be supported by proof or completely struck from the report.

¶62:  By striking the alleged conviction in paragraph 60, Schulze's criminal history is 0.

¶64:  The statement that Schulze has an "outstanding" traffic warrant is a baseless claim.  However, Schulze did have "several outstanding criminal violations" for not having his dog on a leash.  In an effort to clear his good name, Schulze moved the matter for dismissal, which was effected on June 28,

2005. (<u>See</u> Exhibit **"N"**). Therefore, paragraph 64 must be struck as there are no outstanding warrants.

¶66: Schulze disputes the information contained in paragraph 66. To his knowledge and belief, no arrest was actually made and no charges were ever filed.

¶¶82 and 83: The correct maximum term of imprisonment for each of Counts 1, 2 and 3 is one (1) year, pursuant to 21 U.S.C. § 841(b)(1)(D)(3), for "some other prohibited drug."

¶84: The correct total offense level of 6 and a criminal history category of I, the guideline range for imprisonment is zero to six (0 - 6) months.

¶85: The correct guideline range is in Zone A.

¶87 and 88: No supervised release is recommended under 21 U.S.C. § 841(b)(1)(D)(3).

¶89: U.S.S.G. § 5D1.2(b) is not applicable.

¶90: Probation is not precluded under 21 U.S.C. § 841(b)(1)(D)(3).

¶91: U.S.S.G. § 5B1.1(b)(2) in not applicable.

¶¶92 and 93: The correct maximum fine for each Count is $100,000, pursuant to 21 U.S.C. § 841(b)(1)(D)(3).

¶95: U.S.S.G. §§ 5E1.2(c)(1) and 5E1.2(c)(4) is not applicable.

¶¶97 and 98: No amount of "public harm" was caused by "Counts 2 and 3" because Olaes turned the substance over to the FBI following both occurrences. Therefore, paragraphs 97 and 98 of the presentence report are inapplicable.

¶101: Schulze intends to submit a post-Booker Sentencing Memorandum in which various mitigating circumstances will be raised to warrant departures.

Respectfully submitted,

Michael F. Schulze
Defendant, pro se

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing document was duly served upon the following persons by delivering the same to:

KENNETH M. SORENSON
Assistant U.S. Attorney
Office of the U.S. Attorney
PJKK Federal Building, Room 6-100
300 Ala Moana Boulevard
Honolulu, Hawaii 96850

ROSANNE DONOHOE
U.S. Probation Office
PJKK Federal Building, Room C-126
300 Ala Moana Boulevard
P.O. Box 50111
Honolulu, Hawaii 96850

DATED: May _____, 2007, at Honolulu, Hawaii.

By: _____
Gretchen V. Schulze, for
MICHAEL F. SCHULZE
Defendant, pro se