IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 02-00090-DAE |
| Plaintiff, | ) | |
| vs. | ) | MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR INVOCATION OF SUPERVISORY POWERS TO REVERSE CONVICTION AND DISMISS INDICTMENT |
| MICHAEL F. SCHULZE, | ) | |
| Defendant. | ) | |

MEMORANDUM OF LAW

I. **INTRODUCTION**

On September 2, 2003, following jury trial, Schulze was sentence to 30 years' imprisonment for conspiring to possess and distribute, and distribution of a controlled substance, in violation of 21 U.S.C. §§ 846 and 841(a)(1). Schulze appealed. On November 28, 2005, the Ninth Circuit Court of Appeals remanded Schulze back the the jurisdiction of the District Court of Hawaii for resentencing. Schulze now moves the District Court to invoke its supervisory powers and reverse his conviction and dismiss his indictment on the grounds of prosecutorial misconduct (under the doctrine of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and for deliberate deception), as well as outrageous government conduct (fabricating evidence and committing perjury).

II. **BACKGROUND**

On August 17, 2001, Steven Olaes (Olaes), contacted the Honolulu field Office of the FBI and expressed an interest in becoming an informant. A subsequent meeting ensued between Olaes and Special Agent Cindy Maglasang (Maglasang) in which Olaes agreed to conduct drug transactions and record his conversations with others under the direction of the FBI.

-2-

Between August of 2001 and March of 2002, Olaes conducted several drug transactions and recorded numerous conversations. On April 2, 2002, Schulze was arrested and charged with distributing a controlled substance to Olaes on August 30, 2001, and October 2, 2001.

On October 21, 2002, Schulze moved to suppress the tape recordings made by Olaes, citing that his assent to record private conversations was a subterfuge to commit and further his own criminal and tortious objectives, which, pursuant to 18 U.S.C. §§ 2511(2)(d) and 2515, required suppression. Specifically, Schulze challenged Olaes' consent on the grounds that his sole purpose for assisting the FBI was to access free drugs that he stole from targets of the investigation, as well as using information intercepted to engage in his own drug distribution.

On November 4, 2002, the Government responded by stating that "[T]he consensual recordings in this case were conducted under the color of law pursuant to section 2511(2)(c)...." (Government's Collective Response at 16, **Exhibit "A"**).

On November 18, 2002, the District Court heard oral arguments and denied Schulze's motion to suppress. In its written opinion, the Court found that **"all Informant's communications were made under the color of law...."** (emphasis added), and "that 18 U.S.C. § 2511(2)(d) does not apply in this situation." (Court's Order at 8, **Exhibit "B"**).

On December 6, 2002, the Government conducted a teleconference with Olaes during which he confirmed the allegations set out in Schulze's motion to suppress Olaes' recordings, and on December 17, 2002, provided Schulze a letter of information.

On December 26, 2002, Schulze moved the Court to reconsider its order denying his motion to suppress Olaes' recordings based on Olaes' information.

On January 13, 2003, the Government responded to maintain that "the

recordings made by Olaes were authorized by the FBI and made with FBI equipment." The Government supported its position by citing that "Section 2511(2)(c) makes it plain that consensual recordings made under color of law are lawful." And relying of a variety of Circuit authority, the Government insisted that "[W]hen assessing whether someone acted under the 'color of law' for the wiretap statute, the question is whether the witness was acting under the government's direction when making the recordings." (Government's Response at 6 and 7, **Exhibit "C"**).

On January 23, 2003, the Court denied Schulze's motion for reconsideration, stating that "the Government authorized the recordings of all conversations between the CI and various targeted persons." (Court's Order at 12, **Exhibit "D"**).

On January 30, 2003, Schulze's jury trial commenced where the Government submitted seven audio recordings made by Olaes which were played during trial to support the allegation that Schulze distributed a controlled substance to Olaes on August 30, 2001 (Count 2), and October 2, 2001 (Count 3), which were the overt acts to support the conspiracy allegation contained in Count 1. No other occasions of distribution was charged.

During trial, Maglasang disclosed that Olaes was not authorized to conduct drug transactions until his probation expired on October 5, 2001, because she could not obtain approval for Olaes to "undertake criminal activity under [FBI] direction." (Testimony of Maglasang, **Exhibit "E"**).

At trial, the Government introduced summary charts (exhibits 90 and 92) created by FBI Financial Analyst, Conrad Ho, that were based on worksheets manufactured by Maglasang which were designed to reflect account deposits and balances. During the course of trial, the prosecutor, Ho and Maglasang (while under oath), made statements that were based on the findings projected in Maglasang's worksheets.

III. **ARGUMENT**

    A. <u>The Prosecutor Purposely Concealed Material Information During The Suppression Hearing And Reconsideration Attempt That Would Have Rendered The Audio Recordings Inadmissible At Trial.</u>

Title 18 U.S.C. § 2511(2)(c) states:

> It shall not be unlawful under this chapter [18 USCS §§ 2510 et seq.] for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

<u>Title 18 U.S.C. § 2511(2)(c)</u>. For a person to be considered acting under color of law, he must be acting under the direction of government agents. <u>United States v. Tousant</u>, 619 F.2d 810, 813 (9th Cir. 1980)("informers acting under the direction of government agents are also excluded because they are acting under color of law.")

Section 2511(2)(d) provides a clause to § 2511(2)(c) that reads:

> "unless such communication is intercepted for the purpose of committing and criminal and tortious act in violation of the Constitution or laws of the United States or any State."

<u>Title 18 U.S.C. § 2511(2)(d)</u>. Section 2515 of 18 U.S.C. states:

> Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence at any trial, hearing, or other proceeding in and before any court, grand jury, ... if the disclosure of that information would be in violation of this chapter [18 USCS §§ 2510 et seq.]

<u>Tile 18 U.S.C. § 2515</u>. In the instant case, the Prosecutor argued that Olaes was excluded from §§ 2511(2)(d) and 2515 because his criminal acts were committed under the direction of a government agency (FBI), and therefore the recordings made by Olaes during the commission of his crimes were not subject

-5-

to suppression.

The fact revealed at trial, however, is that Olaes was not under the direction of the FBI, at least not until his probation expired on October 5, 2001 (See Exhibit "E"), because Maglasang testified that she could not obtain authorization to allow Olaes to conduct drug transactions while he was on state probation. Therefore, Olaes was not acting under color of law when he purchased a controlled substance on August 30th and October 2nd, 2001 (Counts 2 and 3, respectively). And because Olaes committed those crimes in violation of the laws of the United States (21 U.S.C. § 841(a)(1)) and the State of Hawaii (HRS § 803-42), the recordings made during this period were illegal and should have been suppressed pursuant to 18 U.S.C. §§ 2511(2)(d) and 2515.

However, instead of disclosing this material information, the Prosecutor chose to conceal it and maintain that "[T]he consensual recordings in this case were conducted under color of law pursuant to section 2511(2)(c) ..." (See Exhibit "A"). The Prosecutor purposely concealed Maglasang's failed attempt for authorization because the recordings made by Olaes between August 30th and October 5th, 2001, made up the bulk of the Government's case in chief, and it also gave rise to Counts 2 and 3, which formed the basis of Count 1. Without these recodings, the Indictment would have been dismissed. The Prosecutor's deliberate withholding of this material information violated Schulze's substantial rights, thereby causing him prejudice by altering the outcome of the proceedings.

A prosecutor's deliberate withholding of evidence favorable to the defense is a violation of due process. Brady v. Maryland, 473 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Due process requires reversal of a conviction if the court determines "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings

would have been different." United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

To establish a violation under Brady, there must be a demonstration that the Prosecutor (1) suppressed material; (2) that was favorable; and (3) that the suppression caused prejudice. See United States v. Danielson, 325 F.3d 1054, 1075 (9th Cir. 2003). Here, these three conditions are satisfied.

To begin with, the Prosecutor was aware that Olaes was not authorized to conduct drug transactions until October 5, 2001, because the date of his concurrence with Olaes' Tier II criminal activity authorization was not until October 22, 2001. **(Exhibit "F")**. And even if Maglasang concealed her failure to obtain authorization, a "prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf." Kyles v. Whitley, 514 U.S. 419, 437 (1995). And "[W]hile the government does not have the duty to disclose information of which it is not aware, if a government agency is charged with administration of a statute and has consulted with the prosecution in the case, the agency will be considered part of the prosecution, and its knowledge of Brady material will be imputed to the prosecution." United States v. Wood, 57 F.3d 733, 737 (9th Cir. 1995). Here, the Prosecutor did provide defense with Olaes' arrest record, which indicated he was on probation during a significant period of the investigation, however, the Prosecutor did not provide any information concerning the Government's failed attempt to gain permission to engage Olaes to undertake criminal activity. This was material information known to the Government but purposely concealed from the defense.

Had this information been disclosed pre-trial, the law would have required suppression of the recodings because illegally obtained evidence "is inadmissible in a Government's direct case, or otherwise, as substantive evidence of guilt." United States v. Watson, 118 F.3d 1315, 1319 (9th Cir.

1997)(citing United States v. Havens, 446 U.S. 620, 628 (1980)). "Whether accused's right to due process was violated by failure to disclose evidence is determined by whether the undisclosed evidence was so important that its absence prevented the accused from receiving his constitutionally guaranteed fair trial." United States v. Hibler, 463 F.2d 455, 459 (9th Cir. 1972).

Without the recordings made by Olaes between August 30th and October 5th, 2001, the Indictment would have been dismissed because the evidence derived from the recordings, i.e., the quantity of controlled substance received by Olaes, would have also been suppressed. Moreover, without these recordings, probable cause would not have been established to support the search warrant that lead to the seizure of financial documents and assets also introduced at trial, and, because no other evidence exists in this case, that standing alone, would satisfy the proof beyond a reasonable doubt standard required to obtain a criminal conviction.

In fact, the Indictment in this case would not have been returned because 18 U.S.C. § 2515 specifically states that illegally intercepted recordings, or any evidence derived therefrom, may not be relied upon at a proceeding before a grand jury. See 18 U.S.C. § 2515. Because no other criminal acts are alleged to have involved Schulze beyond the period of Olaes' probation, excluding the evidence derived from the illegal recordings would have eliminated the only means to obtain an indictment.

Maglasang's disclosure of the recording's illegal origin during trial does not eliminate the prejudice caused by the deliberate withholding of favorable information during the pre-trial suppression hearing. "If previously undisclosed evidence is disclosed, during trial, no Brady violation occurs unless the defendant has been prejudiced by the delay." United States v. Word, 806 F.2d 658 (6th Cir. 1986). Here, the prejudice is clear - the concealed information that would have forced suppression of all

evidence and dismissal of the Indictment was extremely favorable to Schulze, and the Prosecutor's deliberate withholding of this information caused Schulze substantial prejudice by allowing his conviction to be based on evidence that the Government knew had been illegally obtained.

### B. The Prosecutor Deliberately Deceived the District Court Into Believing that "All" Recordings Made by Olaes Were Under Color of Law When in Fact Those Supporting the Indictment Were Not.

Despite knowing that Olaes was not authorized to conduct drug transactions until October 5th, 2001 (see Exhibit "F"), which was after the bulk of the recodings had been made, the Prosecutor deliberately deceived the District Court into believing that Olaes was acting under color of law, i.e., under the Government's direction, throughout the entire investigation and that <u>all</u> recordings were legally obtained, by stating:

> [Olaes] "voluntarily and willingly undertook the task of covertly acting as an undercover operative working for the FBI.... the consensual recordings in this case were conducted under the color of law...."

(Government's Collective Response, November 4, 2002, pages 15 and 16).

> "The consensual recordings in this case were made and authorized by the Federal Bureau of investigation.... the recordings made by Olaes were authorized by the FBI and made with FBI equipment."

(Government's Response to Defense Motion for Reconsideration, January 13, 2003, Exhibit "C"). The evidence that the District Court believed the Prosecutor is contained in the Court's written orders denying Schulze's motion(s) to suppress and reconsider, stating:

> "The Government challenges Defendant's argument by asserting that 18 U.S.C. § 2511(2)(d) is only applicable to consensual recordings and not those made 'under color of law.' The Government asserts that all Informant's communications were made under

-9-

> color of law.... This court finds that
> 18 U.S.C. § 2511(2)(d) does not apply in
> this situation."

(Count's Order Denying Motion to Suppress, November, 26, 2002, Exhibit "B").

> "As the Government argued in its
> opposition to both the original motion to
> suppress as well as the current motion
> for reconsideration, the Government
> authorized the recordings of all
> conversations between [Olaes] and various
> targeted persons."

(Court's Order Denying Motion for Reconsideration, January 23, 2003, **Exhibit "G"**). Here, the Prosecutor deceived the court into denying Schulze's motions to suppress by maintaining that all recordings were made under color of law, when in fact those supporting the Indictment were not and should have been suppressed. The Prosecutor also deceived the defense.

The Prosecutor's willful withholding of favorable information and deliberate deception "not only deprives the defense of certain evidence, but it also has the effect of representing to the defense that the evidence does not exist. In reliance on this misleading representation, the defense might abandon lines of independent investigation, defense, or trial strategies that it would otherwise have pursued." Bagley, 473 U.S. at 684. Such is the case here, where the defense abandoned all attempts to challenge the recordings and evidence derived from them because the Prosecutor maintained that Olaes' criminal activities committed while on probation were authorized by the FBI when in fact they were not. And defenses' reliance on the Prosecutor's oath to uphold justice rendered it unsuspecting when the truth was revealed during trial, which is after the illegally obtained evidence had been admitted.

In further attempts of deception, the Prosecutor called Special Agent Terrence Chu to testify at the November 18th suppression hearing in support of the statements contained on the Government's response, where Agent Chu stated:

> "pretty close to August of 2001, ... [Olaes]

-10-

> mentioned [an] interest in becoming
> involved in an investigation, ... [we] got
> him to fill out a few documents, [and] had
> him start making some consensually
> recorded telephone calls ..."

(Testimony of Terrence Chu, November 18, 2002, see **Exhibit "H"**). Although Agent Chu's testimony avoided the issue of any drug transactions performed in the case, it was deceiving by way of indicating that Olaes was an active informant since "August of 2001", despite the concealed fact that the drug transactions of August 30th and October 2nd, were committed without any legal authorization whatsoever. Agent Chu's testimony deceived all into believing that each act committed by Olaes was under color of law.

In another instance of deception, FBI Agent Maglasang submitted a declaration in support of the Government's response to Schulze's motion for reconsideration, where Maglasang stated that:

> "In August 30, 2001, the FBI began working
> with then confidential informant Steve
> Olaes in an investigation.... On August
> 30, 2001, prior to completing Olaes'
> informant sign up approval, Olaes
> contacted me and advised me that he had
> received 2 ounces of methamphetamine...."

(Declaration of Cindy Maglasang, **Exhibit "I"**). Here, Maglasang's deception is obvious as she indicated Olaes was an informant who conducted a drug transaction on her behalf in August of 2001, despite the concealed fact that she was refused authorization to allow Olaes to perform drug transactions until October 5, 2001. Without legal authorization, the drug transactions committed by Olaes were illegal, however, Maglasang allowed Olaes to violate federal and state drug laws, which helped disguise the truth and deceive others into believing that Olaes' criminal acts were properly sanctioned.

Among all the forms of deception submitted, the most compelling was delivered during the November 18th suppression hearing, where the Prosecutor orally informed the court that the October 2nd drug transaction was

-11-

"observed, monitored -- electronically monitored conversation and drug sale that took place in Schulze's house." (**Exhibit "J"**). Not only was this statement untrue, as the alleged meeting was not observed or electronically monitored, but the fact that the FBI conducted a controlled drug transaction during the period where Olaes was forbade from participation gave rise to the belief that Olaes was acting under the Government's direction and therefore the evidence gathered was legally obtained under color of law.

It has long been held that the district courts have the authority to dismiss actions where government attorneys have "willfully deceived the court, thereby interfering with 'the orderly administration of justice.'" United States v. Lopez, 4 F.3d 1455, 1463 (9th Cir. 1993)(citing United States v. National Medical Enters., Inc., 792 F.2d 906, 912 (9th Cir. 1986). Here, the Prosecutor's deliberate deception not only interfered with the orderly administration of justice, it violated Schulze's constitutionally protected due process rights and caused him substantial prejudice, and it violated the cannon of ethics and the oath of justice that a prosecutor is sworn to protect and uphold. These deliberate acts justify a dismissal.

### C. Schulze's Due Process Rights were Violated by the Government's Fabrication of Evidence and Perjured Testimony During Trial.

"To violate due process, governmental misconduct must be 'so grossly shocking and so outrageous as to violate the universal sense of justice.'" United States v. Berrera-Moreno, 951 F.2d 1089, 1092 (9th Cir. 1991)(citing United States v. Restrepo, 930 F.2d 705, 712 (9th Cir. 1991). "Due process is not violated unless the conduct is attributable to and directed by the government." Berrera-Moreno, 951 F.2d

In the instant case, Maglasang manufactured worksheets that contained double and triple-counted deposits, transfers, and withdrawals of various bank

accounts of Schulze, his mother, and fiancee, Alena Olaes. These worksheets were then provided to FBI Financial Analyst, Conrad Ho (Ho), who then created summary charts and spreadsheets for use as Government exhibits, and testified to the accuracy of those exhibits despite knowing that his summary charts contained false information. For example.

On October 3, 1997, Gretchen Schulze obtained a loan from Pearl Harbor Federal Credit Union for $37,000. (See line 22 of Maglasang's worksheet, **Exhibit "K"**). On that same day, Gretchen Schulze transferred $30,000 of her loan into Schulze's checking account. (See line 83, Page 3 of 8, **Exhibit "L"**). Despite the knowledge of the $30,000 loan, Maglasang included that amount in her Total Deposits column of her worksheets of Schulze's checking account. (See line 185, Page 6 of 8, Exhibit "L"). This $81,590.04 exaggerated figure, which is more than double the actual deposits made (see line 224, Page 7 of 8, Exhibit "L"), was then placed in Maglasang's overall accounts worksheet. (See line 25, Exhibit "K"). This particular worksheet, which included the same $37,000 loan ($30,000 of which had been counted twice) and other exaggerated figures, demonstrated a total of deposits in the amount of $1,118,698.57. Agent Ho then created spreadsheets and summary charts from the worksheets (**Exhibit "M"**) which reflects the $1,118,698.57 figure Maglasang fabricated. Ho then testified to the total deposits in his summary charts. (**Exhibit "N"**).

The Prosecutor also made statements during trial that were based on Maglasang's fabricated evidence. For example, the Prosecutor stated:

> "Gretchen Schulze, Mike's mother, she had close to ten accounts at Pearl Harbor Federal Credit Union. I have no idea why she had so many accounts. Some of this 344,000, I'm going to tell you right now, was hard-earned, legitimate income. We got about $100,000, 90-something-thousand dollars in income to her that we know was legitimate because we got her tax returns"

(**Exhibit "O"**). The prosecutor then elicited testimony from Maglasang over evidence they both knew had been fabricated, where Maglasang was asked: "is there evidence in this case that indicates that monies -- large amount of monies went through bank accounts controlled by [Gretchen Schulze]?", and answered: "Yes". (Trial Transcript at 3:89). The prosecutor then elicited testimony from Ho over evidence they both knew had been fabricated, where Ho was asked: "what are the total bank deposits into the Gretchen Schulze ten bank accountes?", and answered: "$344,371." (Exhibit "N").

These statements were completely false as there was never an amount remotely close to that fabricated by Maglasang and repeated by Ho. And the prosecutor knew since October 2002 (before the Second Superceding Indictment was returned) that the "ten accounts" included four loans, an IRA and two Money Market Certificates that constituted several thousand dollars (see Exhibit "K"), all of which Maglasang and Ho considered "income", and of which held one-third the account balances the Government falsely represented to the jury. And the example above is just one of many in existence.

Under the doctrine of Napue v. Illinois, 360 U.S. 264, 269-72 (1959), a conviction violates the [Fifth] Amendment if it is obtained by use of perjured testimony which the prosecution knows to be false or later discovers to be false and allows to go uncorrected. Here, the prosecutor's untrue statements to the jury, the introduction of fabricated evidence, and the elicitation of perjured testimony, clearly violated the Fifth Amendment. Moreover, use of the fabricated evidence not only affected the outcome of the trial, but it affected the outcome of the criminal forfeiture trial in which the Government sought to forfeit numerous assets of Schulze's by claiming the assets were purchased with undocumented income demonstrated by Ho's spreadsheets and summary charts.

There can be no way to determine whether the jury would have found Schulze guilty had the Government not submitted its fabricated financial evidence and testified to its accuracy. A defendant's conviction must be reversed on due process grounds where the Government knowingly elicits, or fails to correct, materially false statements from its witness. United States v. Haese, 162 F.3d 359, 365 (5th Cir. 1998). This is especially true when it is government agents themselves who are the witnesses that testify falsely. And that, constitutes outrageous government conduct. Accordingly, Schulze's conviction should be reversed and his indictment dismissed. See United States v. Simpson, 813 F.2d 1462, 1464-65 (9th Cir.), cert. denied, 484 U.S. 898, 108 S.Ct. 233, 98 L.Ed.2d 192 (1987)(dismissal of an indictment is warranted where outrageous law enforcement conduct violates due process.)

### D. This Court Should Invoke Its Supervisory Powers to Reverse Schulze's Conviction and Dismiss the Indictment with Prejudice.

"Federal courts have inherent but limited supervisory powers to formulate procedural rules." United States v. Morales, 328 F.3d 1202, 1205 (9th Cir.), cert. denied, - U.S. -, 124 S.Ct. 491, 157 L.Ed.2d 391 (2003). "A court may exercise its supervisory powers to dismiss an indictment in response to outrageous government conduct that falls short of due process violation." United States v. Barrera-Moreno, 951 F.2d 1089, 1091 (9th Cir. 1991). "As with the power to dismiss an indictment for due process violations, supervisory powers do not flow from Rule 33. Supervisory powers are a means by which federal courts fulfill their role in the criminal justice system: 'Judicial supervision of the administration of criminal justice in the federal courts implies the duty of establishing and maintaining civilized standards of procedure and evidence.'" United States

v. Ross, 372 F.3d 1097, 1107 (9th Cir. 2004)(citing McNabb v. United States, 318 U.S. 322, 340, 63 S.Ct. 608, 87 L.Ed 819 (1943).

On remand for resentencing, this Court has the authority to assert jurisdiction and consider Schulze's post-remand motion for invocation of supervisory powers to reverse his conviction and dismiss his indictment on the grounds of due process violations. C.f., Ross, 372 F.3d at 1104-05 ("[I]t would be unreasonable, though, to conclude that, in properly asserting jurisdiction over a new trial motion that alleges new evidence, a court may not also reserve the right to dismiss the indictment if subsequent proceedings warrant such a remedy.")

In United States v. Owen, 580 F.2d 365, 367 (9th Cir. 1978), the Ninth Circuit adopted the view that, in order to justify dismissal of the indictment under the court's supervisory powers, there must "be some prejudice to the accused by virtue of the alleged acts of misconduct." In United States v. Larrazolo, 869 F.2d 1354, 1358 (9th Cir. 1989), the court held that "a defendant must be actually prejudiced in order for the court to invoke its supervisory powers to dismiss an indictment for prosecutorial misconduct."

The deliberate withholding of Brady material that would have forced suppression of the Government's only evidence, as well as deceiving the Court and defense during the pre-trial phase of this matter did, in fact, cause substantial prejudice to "trigger" this Court's exercise of its supervisory powers. United States v. Isgro, 974 F.2d 1091, 1097 (9th Cir), cert. denied, - U.S. - , 113 S.Ct. 1581, 123 L.Ed.2d 148 (1983).

Where the defendant asks the district court to use its supervisory powers to dismiss an indictment for outrageous government conduct, the proper prejudice inquiry is whether the government conduct "had a least some impact on the verdict and thus redounded to [the defendant's] prejudice."

-16-

United States v. Lopez, 4 F.3d 1455, 1464 (9th Cir. 1993). Both verdicts in this case were impacted by the fabricated evidence and perjured testimony. The jury was undoubtedly influenced by the financial spreadsheets and summary charts created by a federal agent that showed well over one million dollars in income that three Government Officers testified were the proceeds of Schulze's illicit activities, and, this also influenced the jury during the criminal forfeiture trial where the Prosecutor again stated that all of the seized assets the jury was to determine were subject to forfeiture, had been purchased with undocumented income. Here, the fabricated evidence and perjured testimony had an impact on both verdicts and caused Schulze substantial prejudice. For all the reasons stated above, this Court should invoke its supervisory powers so as to fulfill the administration of criminal justice.

## IV.  CONCLUSION

**FOR GOOD CAUSE HAVING BEEN SHOWN,** defendant Michael F. Schulze prays this honorable Court GRANT this motion and invoke its supervisory powers to REVERSE his conviction and DISMISS his Second Superceding Indictment WITH PREJUDICE so as to avoid a manifest miscarriage of justice.

DATED: Honolulu, Hawaii, May 8, 2007.

Respectfully submitted,

_____
MICHAEL F. SCHULZE
Defendant, pro se